UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS.:                                    Civil Action No. 03 12099 PBS

DONALD ACHER,
        Plaintiff,

v.

FUJITSU NETWORK COMMUNICATIONS, INC.
        Defendant.

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION OR IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM

**Introduction**

In October, 2003, the Plaintiff, Donald Acher ("Acher") filed a 3 count complaint against Fujitsu Network Communications, Inc. ("Fujitsu") in Worcester Superior Court, alleging wrongful termination in violation of public policy (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and breach of contract (Count III). Fujitsu removed the matter to Federal District Court in Boston[1], and immediately filed the instant motion to compel arbitration, or alternatively, to dismiss for failure to state a claim. For the reasons described below, Fujitsu's motion must be denied.

---

[1] Acher filed a motion to change the venue from Boston to Worcester, a motion which is currently pending before the court. By filing this opposition to Fujitsu's motion to dismiss, Acher does not waive his right to have the case transferred to Worcester or any other right associated with the motion for change in venue.

1

**Relevant Facts**

Acher was employed with Fujitsu as a Senior Sales Manager for the New England Region from August 1993 through June 11, 2003 (Complaint, paragraph 5). Acher's compensation included commissions based upon a sales incentive plan (Complaint, paragraphs 6, 7). Acher's primary account was Verizon (Complaint, paragraph 9). In 2002, Fujitsu was developing its proposal for its newest telecommunication hardware system, Flashwave 4000 Series Next Generation Sonet (Complaint, paragraph 12). Douglas Moore, Fujitsu's Vice President of Sales, wanted Fujitsu to increase its market share with Verizon (Complaint, paragraph 13). Moore wanted the proposal to include a requirement that Fujitsu's competitor's hardware at Verizon be destroyed, removed or rendered inoperable (Complaint, paragraph 18). Acher opposed this portion of the proposal, indicating that by rendering inoperable any of the competitor's equipment would result in a serious safety hazard, impacting the integrity of the Network Equipment Building Systems (Complaint, paragraph 19). The portion of the proposal opposed by Acher was ultimately removed by Fujitsu (Complaint, paragraph 21). In May, 2003, the Fujitsu proposal was accepted by Verizon (Complaint, paragraph 25)[2]. On June 11, 2003, Acher was arbitrarily terminated without notice (Complaint, paragraph 26).

Throughout Acher's employment with Fujitsu, he has never been provided a copy of, or informed of the existence of, any arbitration policy as referenced in Melanie Scofield's affidavit[3].

---

[2] Based upon this agreement being accepted, Acher was expected to receive commissions for the balance of the half fiscal year (through September 30, 2003). These commissions were reasonably anticipated based upon his past services. These commissions were not based upon any future service that needed to be performed (Acher affidavit, paragraph 11).

[3] The first time that Acher saw the arbitration agreement that is referenced by Attorney Scofield is subsequent to his termination in June, 2003.

Acher has never seen the September 22, 1994 memorandum regarding arbitration, the question and answer attachment referencing mandatory arbitration for all employees, nor any revision to the arbitration policy (Acher affidavit, paragraphs 4-6). Acher has been required to sign other employment related agreements, including confidentiality and proprietary agreements, some of which have been signed on an annual basis, but has never been asked to sign any document acknowledging his knowledge of the arbitration policy or his agreement with the policy (Acher affidavit, paragraph 6). If presented with an arbitration policy during his employment, Acher would not necessarily have continued his employment with Fujitsu. (Acher affidavit, paragraph 7)

Following his separation from Fujitsu in June, 2003, Acher was provided with an "Employment Separation Agreement and Release of All Claims." In paragraph 17 of the original Release, it notes as follows, "With the exception of the Employee Proprietary Information and Invention Agreement which remains in full force and effect, there are no other contractual agreements between the Company and the Employee. This is the entire agreement regarding the subject matter hereof and supersedes all previous and contemporaneous discussions, negotiations, agreements and understandings related thereto. No other promises or agreements have been made, and there are no other contractual relationships between Company and Employee" (Acher affidavit, paragraph 8). The agreement was not signed by Acher.

**Argument**

### Fujitsu's Motion to Compel Arbitration Must Be Denied

In Fujitsu's Motion to Compel Arbitration, it argues that Acher was subject to an arbitration policy due to his employment with Fujitsu. In arguing same, Fujitsu relies upon the affidavit prepared by Attorney Scofield and the arbitration policy and related attachments thereto.

3

However, in order to compel Acher to arbitrate his claims and substitute the arbitral forum for a judicial forum, Fujitsu must show, at a bare minimum, that the "protagonists have agreed to arbitrate some claims.[4] Brennan v. King, 139 F. 3d 258,264 (1st Cir. 1998); McCarthy v. Azure, 22 F. 3d 351, 354-55 (1st Cir. 1994). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Intergen v. Grina, 344 F. 3d 134 (1st Cir. 2003); United Steel Workers v. Warrior and Gulf Navigation Company, 363 US 574, 582 (1960); Hightower v. GMRI, Inc., 272 F. 3d 239, 242 (4th Cir. 2001).

Here, there is a material disputed fact whether Acher ever knew of the arbitration policy, let alone agreed to be bound by it. Acher submits his affidavit, clearly indicating his lack of knowledge of the initial announcement by Fujitsu in 1994 regarding the new arbitration policy and any subsequent policy as later drafted and amended by Fujitsu. Without same, Acher cannot be bound by the policy[5]. See generally, Rosenberg v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.,

---

[4] When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply state law principles that govern the formation of contracts. Rosenberg v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 170 F. 3d 1, 19 (1st Cir. 1999); Mugnano-Bornstein v. Crowell, 42 Mass. App. Ct. 347, 350 (1997) (a party cannot be required to submit to arbitration any dispute which he has not agreed to submit).

[5] The argument advanced by Fujitsu and the out of circuit cases cited thereto, that Acher is nonetheless bound by the policy even if he didn't "sign on to" same is not helpful to Fujitsu's position. In Hightower, the employee acknowledged attending meetings where the dispute resolution policy was circulated and discussed. His continued employment after the policy was circulated and discussed was found to be the necessary consideration needed to bind the employee. Here, Acher had no notice of the terms of the agreement, no ability to decide whether the policy impacted his employment with Fujitsu and therefore, cannot be bound by its terms. For example, the original policy announcement and Q and A as submitted by Fujitsu required all employees to pay half of the arbitration costs. This requirement, along with a limited opportunity for discovery, if made known to Acher may have caused him to seek employment elsewhere.

170 F. 3d 1, 18 (1st Cir. 1999) (several circuits have required the employee's waiver of judicial rights to be knowing and voluntary).

In addition, Fujitsu's arbitration policy compromises Acher's ability to prosecute his claims. Under section 6B of the arbitration policy, Acher is limited to one deposition, unless leave is granted by the arbitrator. Since the burden falls upon Acher to prove all the elements of his claims, the inability to depose all of the necessary witnesses places Acher at a tremendous disadvantage. See, Ramirez-De-Arellano v. American Airlines, Inc., 133 F. 3d 89, 91 (1st Cir. 1997), citing Hoteles condado Beach v. Union De Tronquistas Local 901, 763 F. 2d 34, 39 (1st Cir. 1985)[6] (adequate opportunity must be allowed for each party to present evidence and argument).

Based upon the above, the Defendant's Motion to Compel Arbitration must be denied.

**Motion to Dismiss**

Standard of Review

"In evaluating a motion to dismiss pursuant to the Rules of Civil Procedure, 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences from those allegations in the Plaintiff's favor." Frost v. TGI Friday's Inc., 2001 Mass. Super. Lexis 647, 650 (2001), citing Spinner v. Nutt, 417 Mass. 549, 550 (1994). Any facts which have been "added" by the Defendants beyond the allegations of the complaint must be ignored.

---

[6] Finally, but to a lesser extent, section 7C of the arbitration policy, limits any opposition to a summary judgment motion to 10 days, where the rules of the district court allow for 14 days. Once again, the lesser time prejudices the Plaintiff in presenting his case to the arbitrator.

The Defendant has a "formidable burden of showing beyond a doubt that Plaintiffs could prove no set of facts in support of their claim that would entitle them to recovery." Nader v. Citron 372 Mass. 96, 98 (1977). A claim should not be dismissed simply because it alleges a new theory of liability. "It is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." New England Insulation Company v. General Dynamics Corporation, 26 Mass. App. Ct. 28, 30 (1988).

Public Policy

The Defendant argues that Count I, wrongful termination in violation of public policy, requires dismissal since it does not fit into the narrow exceptions to the employment at will doctrine. Acher disagrees.

"An at will employee has a cause of action for wrongful discharge if the discharge is contrary to public policy." Mistishen v. Falcone Piano Company, Inc. 36 Mass. App. Ct. 243, 245 (1994). The public policy exception has been made available to employees discharged for performing important public deeds, Mistishen v. Falcone Piano Company, Inc., 36 Mass. App. Ct. 243, 245 (1994), even if not required by law to do so, Flesner v. Technical Communications Corporation, 410 Mass. 805, 810-811 (1991), for asserting a legal right, for doing what the law requires or for refusing to disobey the law. Upton v. JWP Businessland, 425 Mass. 756, 757 (1997).

The public policy exception relating to performing important public deeds has included cooperation with a law enforcement agency in a criminal investigation of the employer, Flesner v. Technical Communications Corporation, 410 Mass. 805, 810-811 (1991), enforcement of safety laws, Hobson v. The McLean Hospital Corporation, 402 Mass. 413, 416 (1988), and where an employee

6

reports criminal wrongdoing to individuals within the company, Shea v. Emmanuel College, 425 Mass. 761 (1997).

The exceptions to the employment at will doctrine do not end here, however. In Mistishen, although the appeals court did not view that the Plaintiff's actions (blowing the whistle internally on unfair and deceptive sales practice in reference to piano warranties) violated public policy, it indicated that the actions therein "fell far short of the level of importance necessary to warrant a conclusion that her discharge violates public policy." Mistishen @ 246. In Frost v. TGI Friday's, the court denied the Defendant's motion to dismiss, relying primarily on the language cited above from Mistishen. Judge Fabricant allowed Frost's claim to continue (advising a customer at the restaurant that the plates were not properly sanitized, since the hot water was malfunctioning), since the employer's wrongdoing put the consumer in harm's way or otherwise presented a threat to public health or safety[7]. Frost v. TGI Friday's Inc., 2001 Mass. Super. Lexis 647, 653 (2001). Judge Fabricant found that Frost's allegations filled the gap that was left vacant by the Plaintiff in Mistishen regarding the threat to public health or safety.

Other decisions support the expansion of the public policy exceptions and the denial of Defendant's motion to dismiss. In Rizzo v. Life Care Centers of America, 1999 Mass. Super. Lexis 443, 445 (1999), Judge Quinlan denied the Defendant's motion for summary judgment on the public policy violation, allowing the case to proceed regarding whether or not the Plaintiffs were terminated for enforcing laws and regulations governing nursing homes. In Apessos v. Memorial Press Group,

---

[7] Judge Fabricant refused to dismiss the complaint even though the whistle blowing was made to a customer and not to management or an outside agency. Complaints to management are sufficient to trigger the public policy exception. Shea v. Emmanuel College, 425 Mass. 761 (1997) and Smith v. Mitre Corporation, 949 F. Supp. 949-951 (D. Mass. 1997).

7

2002 Mass. Super. Lexis 404 (2002), Judge Sikora denied the Defendant's motion to dismiss Plaintiff's public policy complaint. In denying the motion, the court allowed Plaintiff's allegations of wrongful termination to proceed based upon her inability to attend work as a result of domestic violence and related court appearances. In deciding same, Judge Sikora indicated that "legislation has been the primary but not the exclusive location of the public policy interest." Apessos v. Memorial Press Group, 2002 Mass. Super. Lexis 410 (2002). Finally, in Sellig v. Visiting Nurse and Community Health, Inc. 1999 Mass. Super. Lexis 243 (1999), Judge McHugh denied Defendant's motion for summary judgment for wrongful termination in violation of public policy, holding that it would be a violation of public policy to terminate an employee for contacting an attorney to discuss her rights.

Which brings us to the current complaint. Acher has alleged that he strongly opposed incorporating a clause in the Fujitsu proposal to Verizon which would have "rendered inoperable" Fujitsu's competitor's equipment. In addressing his concerns to his senior management, Acher indicated that by rendering inoperable the competitor's equipment, safety concerns would result, impacting the integrity of the Network Equipment Building Systems (NEBS). The NEBS standards are intended to ensure that equipment and systems provide reliable service when less than ideal conditions are present, without disrupting other services by nearby carriers or third party owned equipment and without posing undue safety risks and hazards (Complaint, paragraphs 19, 20); See Exhibit 1, excerpt from Underwriters Laboratories Inc. web page regarding NEBS. NEBS specifications fall under the requirements/standards of the American National Standards Institute (ANSI), which is incorporated into the Telecommunications Standards and Specifications for

Materials, Equipment and Construction, 7 CFR 1755, 1755.20 and 1755.522 (Exhibit 2 and 3)[8]. The impact of the proposal, if advanced, would have far greater harm to the public than either the Plaintiffs in <u>Mistishen</u> or <u>Frost</u> and is consistent with the holding in <u>Hobson</u>. The motion to dismiss the public policy claim should be denied.

<u>Motion to Dismiss Count II, Implied Covenant of Good Faith and Fair Dealing, Must Be Denied</u>

Fujitsu argues that Count II of Acher's complaint, breach of the implied covenant of good faith and fair dealing, must be dismissed since he is seeking commissions owed from "additional sales" made after his termination, which is contrary to an appropriate claim for breach of the implied covenant. Acher disagrees.

The implied covenant of good faith and fair dealing as applied to at will employees is breached where the principal seeks to deprive the agent of any portion of a commission due the agent. <u>Fortune v. National Cash Register</u>, 373 Mass. 96, 104-05 (1977). The court found that Fortune is entitled to commissions for work performed. <u>Fortune v. National Cash Register, 373 Mass. 96, 102 (1977).</u> In <u>Fortune</u>, the Plaintiff was seeking commissions on an order signed before his termination, which would have resulted in cash registers being delivered over a 4 year period.

Following <u>Fortune</u>, the Supreme Judicial Court in <u>Kravetz v. Merchants Distributors</u>, 387 Mass. 457 (1982), indicated that the implied covenant applies to prevent employers from being unjustly enriched by depriving employees of money earned and expected. In <u>Gram v. Liberty Mutual Insurance Company</u>, 384 Mass. 659, 660 (1981) (Gram I), the SJC indicated that an employee is entitled to identifiable, reasonably anticipated future compensation, based on past services, that he

---

[8]Federal statutes/regulations may serve as the basis for a whistle blower complaint. <u>Hutson v. Analytic Sciences Corporation</u>, 860 F.Supp. 6 (D. Mass. 1994); <u>Simas v. First Citizens' Federal Credit Union</u>, 63 F.Supp.2d 110 (D. Mass. 1999)

9

lost because of his discharge. The employer is liable for loss of compensation clearly related to past service. Gram v. Liberty Mutual Insurance Company, 384 Mass. 659, 672 (1981) In Gram v. Liberty Mutual Insurance Company, 391 Mass. 333, 334-35 (1984) (Gram II), the SJC, on reviewing the calculations performed by the Superior Court relating to Gram I, indicated that future policy amendments and changes in premium levels are too speculative to be included in the calculation of damages for past services.

The SJC continued its analysis of the implied covenant of good faith and fair dealing in McCone v. New England Telephone and Telegraph Company, 393 Mass. 231, 234 (1984). The court indicated that an employer would be in breach of the covenant if it received a financial windfall from denying to the employee compensation for past services. In McCone, the Plaintiffs were seeking lost future salary increases and pension benefits as a result of their bad faith discharge. The court denied the claim, indicating that the compensation sought by the Plaintiffs was for future services, not services already performed. The court relied upon Gram I and II, indicating that career credits (money paid annually based upon longevity with the company) is not related to specific past services and is not compensable.

In Cataldo v. Zuckerman, 20 Mass. App. Ct. 731, 739-41 (1985), the Appeals Court expanded the Fortune principles. The Court allowed the plaintiff to recover damages for a later vested share of the developer's equity in each ...project then viable... was sufficiently an identifiable future benefit reflective of past services, as long as the plaintiff had significant responsibilities in that project, spend significant amount of work on the project and the work on the project was beyond mere hope and prophecy, with a reasonable possibility of continuation to completion.

Finally, in King v. Driscoll, 424 Mass. 1, 5 (1996), the court indicated that the Plaintiffs may

10

recover damages for denial of earned compensation reflective of work performed prior to termination. The line of cases from Fortune to Cataldo through King stand for the proposition that an employee cannot be deprived compensation for past services at the time of termination. The implied covenant of good faith and fair dealing will not compensate a terminated employee, however, for lost compensation based upon future services not yet performed.

Contrary to the position taken by Fujitsu, Acher's claims fall within the guidelines for recovery under the implied covenant of good faith and fair dealing. Under Count II, Acher is not seeking lost salary following his unlawful termination in June, 2003. Prior to his termination, Acher was primarily and significantly responsible for negotiating and closing the deal with Verizon in Massachusetts. This agreement called for Fujitsu to provide Verizon with equipment and services for several years into the future. The exact terms of the agreement are not known buy Acher. As a result of this agreement, commissions are due Acher under the sales incentive plan from June 11, 2003 through September 30, 2003. Although some commissions were paid to Acher as a result of orders received from Verizon prior to June 11, 2003,[9] Acher, like the plaintiffs in Fortune (damages over a four year span) and Cataldo (damages for vested equity in projects already begun), has been deprived of any commissions for orders received after his termination but based upon his past services and the agreement reached with Verizon prior to June, 2003. His complaint for commissions based upon his past services and the executed agreement with Verizon is consistent with the history of cases from Fortune to King. Defendant's Motion to Dismiss Count II must be denied.

---

[9]Acher received commission checks after he was terminated, but the checks did not have the attached breakdown necessary for Acher to know the basis for the commissions. Requests to the company for same have been unsuccessful.

11

Breach of Contract

Fujitsu's Motion to Dismiss count III is premature. The Defendant does not argue that the pleading is inadequate. Instead, the Defendant argues that since the sales incentive plan limits the ability of Acher to earn commissions after his separation, then Acher cannot prevail as a matter of law on a breach of contract claim. This sounds more like a summary judgment argument than a motion to dismiss. If the court is inclined to accept the sales incentive plan as relevant to the motion to dismiss, the Defendant's argument still must fail.

The language in the sales incentive plan, as relied upon by the Defendant,[10] is unclear and confusing, requiring additional testimony as to its meaning and implementation. For example, does 'last day worked' mean last date employed, or does it incorporate leaves of absence, vacation, sick or other time an employee may utilize prior to the last date of employment? Has there been any exceptions to the policy? Has implementation been consistent across the board? Without discovery, those questions remain unanswered.

More importantly however, Acher contends that if the plan is to be interpreted to deny employees compensation for past services rendered, it would violate public policy. The court, in Gram II, touched upon but did not decide whether an employer, through it's sales agreement, may restrict an employee's right to compensation based on a windfall to the employer via the employee's termination, depriving the employee of a clearly identifiable future compensation reflective of employee's past services. Gram v. Liberty Mutual Insurance Company, 391 Mass. 333, 334-35 (1984). Consequently, this legal theory alone requires that Count III not be dismissed at this time.

---

[10] "QA component pro-rated based on time with the company and based on performance as of last day worked. MF component paid based on MF eligible bookings generated from beginning of fiscal half to last day worked."

12

**Conclusion**

Based upon the foregoing, the Motion to Compel Arbitration or Alternatively, To Dismiss, must be denied in its entirety.

Plaintiff, Donald Acher<br>
by his attorney<br>
<br>
_____<br>
Gary H. Goldberg<br>
120 Main Street<br>
Worcester, MA 01608<br>
(508)797-1018<br>
BBO #: 553887

Dated: November __, 2003

### CERTIFICATE OF SERVICE

I, Gary H. Goldberg, hereby certify that on this ___ day of November, 2003, I filed an original of the Opposition To Defendant's Motion to Compel with the U.S. District Court, United States Courthouse, 1 Courthouse Way, Boston, MA 02110 by first class mail, and forwarded a copy of this Opposition to Motion To Compe by first class mail to counsel for Defendant:

Jeffrey M. Rosin, Esq.
Epstein, Becker & Green, P.C.
111 Huntington Avenue
26th Floor
Boston, MA 02199

_____