**EPSTEIN BECKER & GREEN, P.C.**

ATTORNEYS AT LAW

111 HUNTINGTON AVENUE
26TH FLOOR
BOSTON, MA 02199-7610
617.342.4000
FAX: 617.342.4001
EBGLAW.COM

June 25, 2004

**BY FIRST CLASS MAIL**

Mr. Martin Castles, Civil Clerk
U.S. District Court, District of Massachusetts
595 Main Street
Worcester, Massachusetts 01608

    Re:    Donald Acher v. Fujitsu Network Communications, Inc.:
             Civil Action No. 03-12099

Dear Mr. Castles:

    We write on behalf of Fujitsu Network Communications, Inc. ("FNC") in response to the letter filed by plaintiff, Donald Acher ("Acher"), submitting the opinion of Campbell v. General Dynamics Government et al. (Civil Action No. 03-11848 (NG)). Mr. Acher filed this opinion in further opposition to FNC's Motion to Compel Arbitration Or, Alternatively, Dismiss Complaint For Failure To State A Claim ("Motion").

    As set forth in FNC's Motion, whether an employee agrees to arbitrate an employment dispute is a matter of state contract law and, simply put, Massachusetts has applied liberal standards in finding that an employment contract exists. See O'Brien v. New England Telephone & Telegraph Co., 422 Mass. 686 (1996). Judge Gertner's opinion in Campbell does not change that. Nor does its discussion about e-mail communications with employees apply to Mr. Acher's situation, where FNC distributed a paper copy of a memorandum to Mr. Acher telling him that it was a condition of his continued employment that he agree to arbitrate employment-based claims. (See Defendant's Motion, at 2)

    Judge Gertner has issued an earlier opinion, however, Derrig v. Wal-Mart Stores, Inc., 942 F. Supp. 49 (D. Mass. 1996) (NG), which would support FNC's Motion. In Derrig, Judge Gertner found that the company's manual created contractual obligations on the part of the employer and the employee despite the fact that it had not been signed and contained express disclaimers stating that it was not a contract. Id. at 54-55. A copy of this opinion is attached for

BO:126342v1

ATLANTA · BOSTON · CHICAGO · DALLAS · HOUSTON · LOS ANGELES
NEWARK · NEW YORK · SAN FRANCISCO · STAMFORD · WASHINGTON, D.C.

EPSTEIN BECKER GREEN WICKLIFF & HALL, P.C. IN TEXAS ONLY

the Court's review. In light of FNC's memorandum, this Court should hold that Acher's belief that he was not bound by FNC's arbitration policy was "objectively unreasonable." <u>Id.</u> at 55.

Thank you for your attention to this filing.

Very truly yours,

Jeffrey M. Rosin

cc:   Gary Goldberg, Esq.
      Melanie Scofield, Esq.
      Barry A. Guryan, Esq.

BO:126342v1                             2

942 F.Supp. 49
132 Lab.Cas. P 58,177, 12 IER Cases 188
(Cite as: 942 F.Supp. 49)
C

Page 1

United States District Court,
D. Massachusetts.

Michael A. DERRIG, Plaintiff,
v.
WAL-MART STORES, INC. d/b/a Sam's Club,
Defendant.

Civil Action No. 94-11171-NG.

Sept. 10, 1996.

Employee who was discharged for violating rule in employee handbook stating that associates "may not purchase Code 2 (damaged) merchandise" brought breach of contract action against his former employer. Employer moved for summary judgment. The District Court, Gertner, J., held that: (1) under Massachusetts law, employee's employment was defined by a contract, the terms of which included policies set forth in the associate handbook and manual, and (2) employee violated the rule when he purchased, allegedly on behalf of his father, Code 2 merchandise and the violation itself could reasonably be considered gross misconduct so as to justify his discharge without resort to progressive discipline policy.

Motion allowed and action dismissed.

West Headnotes

[1] Contracts ⚖176(1)
95k176(1)

[1] Federal Civil Procedure ⚖2492
170Ak2492

Under Massachusetts law, interpretation of written contract's terms is a question of law, not fact, and is susceptible to determination at summary judgment.

[2] Labor and Employment ⚖40(1)
231Hk40(1)

(Formerly 255k8(1)   Master and Servant)

Massachusetts law assumes at-will employment, unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment.

[3] Labor and Employment ⚖40(2)
231Hk40(2)

(Formerly 255k20    Master and Servant)

[3] Labor and Employment ⚖771
231Hk771

(Formerly 255k30(6.10)   Master and Servant)

[3] Labor and Employment ⚖782
231Hk782

(Formerly 255k30(6.30)   Master and Servant)

Under Massachusetts law, at-will employee may be terminated by employer, without notice, for almost any reason at all; however, at-will employees are still protected from discharge for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do what the law forbids.

[4] Labor and Employment ⚖50
231Hk50

(Formerly 255k4, 255k2.1 Master and Servant)

On proper proof, personnel manual can be shown to form the basis of an express or implied employment contract under Massachusetts law.

[5] Labor and Employment ⚖50
231Hk50

(Formerly 255k4, 255k2.1 Master and Servant)

Central inquiries in determining whether personnel manual forms the basis of an express or implied employment contract under Massachusetts law are whether employee believed that employment manual constituted the terms and conditions of employment, equally binding on employer and employee, and whether this belief was reasonable under the circumstances.

[6] Labor and Employment ⚖51
231Hk51

(Formerly 255k2.1   Master and Servant)

Under Massachusetts law, the issue was not whether worker believed that he was an at-will employee, a legal conclusion, but rather whether he believed terms of employee manual to be binding on him and on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

942 F.Supp. 49
(Cite as: 942 F.Supp. 49)

Page 2

employer for purposes of determining whether manual created employment contract.

[7] Labor and Employment ⚖=50
231Hk50
(Formerly 255k2.1 Master and Servant)

Employer may not, on the one hand, rely on mandatory nature of policies it spells out in employee manual as the reason for its termination of worker and then, on the other hand, deny contractual force of its manual when it comes to obligations the document might impose on employer.

[8] Labor and Employment ⚖=51
231Hk51
(Formerly 255k2.1 Master and Servant)

Under Massachusetts law, worker's employment was defined by a contract, the terms of which included the policies set forth in associate handbook and manual; worker believed that terms of the manual were binding on both him and employer and worker's general expectation was not objectively unreasonable since both the mandatory language and detail of the handbook and manual reasonably suggested their binding nature.

[9] Labor and Employment ⚖=840
231Hk840
(Formerly 255k30(4) Master and Servant)

Employee violated rule in employee handbook stating that associates "may not purchase Code 2 (damaged) merchandise" when he purchased, allegedly on behalf of his father, a tractor which was "Code 2 merchandise" and the violation itself could reasonably be considered "gross misconduct" as defined in the handbook so as to justify his discharge without resort to progressive discipline policy.

*49 David E. Guthro, Guthro & McAvoy, Melrose, MA, for Plaintiff.

Beth S. Stomberg, Richard E. Quinby, Craig & Macauley, Boston, MA, for Defendant.

MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GERTNER, District Judge.

I. INTRODUCTION

Plaintiff Michael Derrig was terminated from his job with Sam's Club, a division of Wal-Mart Stores, Inc., in November of 1993. Derrig alleges that his employer's decision to fire him violated the terms of his employment contract, as outlined in the various employment manuals provided to store employees.

Defendant, arguing that Derrig was an at-will employee without enumerated contractual rights, moves for summary judgment.

I do not agree with defendant's characterization of Derrig's employment status. However, for the reasons set forth below, I agree that Wal-Mart did not violate its obligations to Derrig when it terminated his employment. Accordingly, I ALLOW summary judgment in favor of the defendant and dismiss this action.

II. BACKGROUND

Plaintiff Michael Derrig was employed by Wal-Mart at its Sam's Club stores [FN1] from around October of 1991 until November of 1993. Initially, he worked as a merchandise manager at the Sam's Club in Scarborough, Maine. He was then transferred to the Sam's Club in Greece, New York in August of 1992. In or around July of 1993, at Derrig's request, he was transferred to the store located in Saugus, Massachusetts, where he worked as a merchandise manager and then as a receiving manager.

> FN1. Defendant Sam's Club is a wholesale merchandise store which offers private memberships for shopping.

Sam's Club distributes two manuals to its employees: the "Wal-Mart Associate Handbook," which, among other things, establishes certain rules regarding employee purchases of the store's merchandise, and the "Sam's Club Manual," which details particular Sam's Club policies, often reinforcing or amplifying the general policies of Wal-Mart. [FN2]

> FN2. According to Derrig, he was presented the Club Manual when he accepted employment at Wal-Mart's Sam's Club. Additionally, he asserts that his decision to accept employment was based, in part, upon the representations to him that employment at Sam's Club was based on a commitment of both employer and employee, consistent with Wal-Mart's corporate policies and as

evidenced in the Sam's Club Manual.

Notably, Derrig asserts that he was never expressly directed to the Wal-Mart Associate Handbook. Notwithstanding, Derrig notes that the personnel manager hiring him referred to Wal-Mart's policies. Furthermore, in his own arguments against summary judgment, Derrig relies on one policy, detailed in the Handbook: the "Open Door--Open Mind Policy." Derrig does not come forward with any evidence that he learned of this policy through documents or presentations other than the Associate Handbook. Accordingly, based on Derrig's own admissions and the absence of credible evidence to the contrary, I shall assume that both manuals guided Derrig's expectations.

The Associate Handbook, distributed to Wal-Mart employees, includes a "Welcome" section, which states, in part:

Wal-Mart has been successful because we have been willing to change the way we do things. We are constantly seeking new ways to better serve our customers and each other. That means that some rules may change because it is a guide, not a legal contract. It is an introduction to our Company culture, a way to inform you of things you should know and do to be successful. But no handbook can cover everything--we encourage you to ask many questions. And remember: in the midst of *51 a constantly changing world, our Company values stay the same and can always guide us.

This statement of purpose is followed by another, in a "General Rules" section:

These rules, and those throughout this booklet, are designed for your well-being and that of our Company. They apply to associates in all divisions. All associates are expected to be aware of and follow them.

Indeed, while the Handbook goes over general principles and organizational features, [FN3] it set out in some detail employee rights and obligations.

> FN3. The Handbook details some general guiding principles ("The customer is always right"), provides outlines of the organizational structure (supervisors are called "coaches") and some features of the stores, including the use of video broadcasts and "Grass Roots Meetings," during which Wal-Mart employees from around the country gather to discuss ideas and concerns.

With respect to employee rights, the Handbook includes the following: It promises training ("We support associates by providing training" ... It's your responsibility to listen, ask questions, learn and apply what you've learned); it spells out the process for evaluations (conducted after ninety days, around six months after a start date and then at or near an employee's anniversary date); and it sets out a system for pay increases (based on performance, considered after the first ninety days and thereafter annually), among other things. In addition, it provides a list of the fringe benefits each employee can expect.

The Handbook also contains an "Open Door--Open Mind" Policy, which promises employees an open line of communication with store managers. The policy states in relevant part: "[I]f you have an idea or a problem, you can go to your Coach to talk about it without fear of retaliation. If you don't feel satisfied with the response, or if your Coach is the source of your problem, you can go to his or her supervisor."

Moreover, the Handbook sets some basic ground rules which employees are told to follow. [FN4] For instance, a "Statement of Ethics" is spelled out--and associates are told that it, without deviation, "applies to all associates." They are also told that they are "responsible for ... reporting any violations of the Statement of Ethics."

> FN4. The Handbook details rules governing almost every aspect of an employees work. For instance, rules with respect to attendance and work hours are set out in unambiguous language: Clocking in at the beginning of the work-day is one of an employee's responsibilities; working off the clock is "against Wal-Mart policy." No employee should work more than six hours without taking a 30 minute break; failure to report to work and to so inform your supervisor for three consecutive days will be considered a voluntary resignation; engaging in non-work activities during work time is "not permitted," nor is "solicitation or distribution of literature." Additionally, Wal-Mart specifically notes that if an employee writes a bad check to the company, that fact may lead to "counseling, being charged for the costs incurred by the Company, and possible termination ..." Additionally, the Handbook states unambiguously: "[W]e consider it a serious violation of company policy if you disclose confidential information to an outsider. Even something as simple as our intercom codes regarding shoplifting must be kept within our Company." Particulars with respect to workplace safety are included in the Handbook, as is the company's "Dress

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

942 F.Supp. 49
(Cite as: 942 F.Supp. 49, *51)

Page 4

Code," with specific reference to Sam's Club employees.

It also details what might happen if an employee fails to follow the rules, discussing circumstances that may lead an employee to be disciplined or terminated--and promises some restraint in this regard. Under a section entitled, "We maintain a strong work ethic," Wal-Mart states, for example, that the first ninety days are a probationary period, or in Wal-Mart's language, a "getting acquainted" period. At the end of that period, if an employee's performance is "unsatisfactory" that employee may find "a change which could include separation from our Company." Beyond that time, employees will be "coached," so that they will improve. The Handbook, indeed, devotes a section to "Coaching," in which Wal-Mart promises that, after the probationary period, "coaches" will assist associates with performance problems by developing plans of action or changing conduct. Wal-Mart specifically acknowledges that this approach, however, is not always applied: Where an employee engages in "gross misconduct," immediate termination *52 is warranted. The Handbook includes examples of such misconduct: fraud, theft, use of alcohol on company property, "[a]buse of the associate discount," and "[u]nauthorized possession or use of Company property."

The Handbook, in a special section for Sam's Club employees, states, among other things, that associates "may not purchase Code 2 (damaged) merchandise."

The Wal-Mart Associates Handbook is supplemented by the Sam's Club Manual. According to Derrig, it was this manual that served as the central document detailing the terms of employment for Sam's Club employees. Two particular provisions are relevant to this action: The first details the conditions under which employees may make reduced price purchases and the second sets out standards for improvement and employee discipline. In a policy section entitled "Code 2 Merchandise," Sam's Club directs employees that they may make some purchases, but that they are restricted from purchasing certain discounted items deemed "Code 2 merchandise" (damaged, returned or low-stock merchandise marked down for quick sale). The restriction says nothing about whose funds are used to make the purchase, or for whom the purchase is made. While associate-partners are not permitted to purchase such merchandise, that restriction does not extend to the family members, including parents, of such employees, if those family members live outside of the employee's household. The Club Manual also contains a section on "Performance Coaching." This section states that it is designed to assist Management Associate-Partners in correcting problems with employees and meting out discipline where necessary. [FN5]

> FN5. The policy states at the outset: "Performance Coaching is a process that has been established to help Associate-partners correct and modify their behavior so they can continue their employment.... Performance Coaching applies to Management and hourly associate-partners. All Management Associate-partners *must* be very familiar with this procedure." Specific sections refer to the manager's treatment of the hourly worker. The policy does not have any subsection delineating specific rights for hourly workers.

On November 5, 1993, relying on the "Open-Mind, Open-Door Policy" articulated in the Associate Handbook, Derrig sent an e-mail message to Chuck Miller, the general manager of the Saugus store. [FN6] In that message, Derrig discusses being "demoted" from the floor. He blames a manager for "unprofessional behavior and favoritism," among other things, and states that he does not "accept blame for what is going on in this Club." He complains that he was being "defamed" in front of other store partners and that he believed there was an effort afoot to "try to force [him] out." He also discusses an incident where he apparently gave keys to an employee who was not authorized to have them. He acknowledged that the move was not "the best thing to do," but went on to say, "I also realize that that's part of the job [taking responsibility] but being screwed and taken advantage of isn't."

> FN6. The e-mail amply confirms that Derrig was aware of the policies articulated in the Associates Handbook; he offers no other explanation for his knowledge of the policy stated therein and repeatedly refers to the policy as the grounds for his memo.

There is no evidence in the record of a corporate response to Derrig's rather expressive memo.

On November 15 or 16, 1993, plaintiff was told by his general manager to reduce the price of two tractors at the Saugus store and to indicate that they were "Code 2 Merchandise," marked down for quick sale.

Apparently, at a time not identified by the plaintiff, his father, David Derrig, expressed an interest in buying a tractor for his personal use. David Derrig did not live

942 F.Supp. 49
(Cite as: 942 F.Supp. 49, *52)

Page 5

with his son.

According to the plaintiff, he told the store's general manager, Mark Buckley, that his father was interested in buying one of the tractors. Buckley expressed concern, particularly with respect to restrictions on employee purchases of Code 2 merchandise. Derrig responded by saying that his father was not a household member and was therefore eligible to purchase Code 2 merchandise. According to Derrig, Buckley never requested that *his father* not purchase the tractor.

*53 On November 19, 1993, plaintiff Derrig, without his father present, signed his father up for a Sam's Club membership. That same day, again without his father present, Derrig himself purchased the "Code 2" tractor. According to plaintiff, he bought the merchandise using his father's card and paid for it with his father's funds.

On November 21, 1993, Wal-Mart discharged Derrig. Buckley told him that the purchase of the tractor was a problem. According to plaintiff, he responded by offering to return the tractor. Buckley did not agree to this resolution. Derrig left the office.

III. *DISCUSSION*

Derrig contests the propriety of this termination. His argument rests on one premise: that store policies set forth in the Associate Handbook and the Club Manual created certain contractual obligations which were breached when Wal-Mart decided to terminate Derrig's employment.

For the reasons set forth below, I find that Wal-Mart's employment manuals do create contractual obligations for both employer and employee. However, I also find that Derrig violated Wal-Mart policies and that his employer's decision to terminate him did not constitute a breach.

A. *Standard of Review*

Summary judgment is appropriate when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995); *Lexington Ins. Co. v. All Regions Chemical Labs, Inc.*, 419 Mass. 712, 713, 647 N.E.2d 399 (1995). Where the moving party makes an initial showing that no genuine issue of material fact exists, the non-moving party may not merely rely on bald allegations to avoid summary judgment. [FN7] *Byrd v. Ronayne*, 61 F.3d 1026, 1030 (1st Cir.1995); *Madsen v. Erwin*, 395 Mass. 715, 719, 481 N.E.2d 1160 (1985). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); *Barbour*, 63 F.3d at 36.

> FN7. As the First Circuit has noted, "[S]ummary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993).

[1] The interpretation of a written contract's terms is a question of law, not fact, and is susceptible to determination at summary judgment. *Lexington Ins. Co.*, 419 Mass. at 713, 647 N.E.2d 399.

B. *Breach of Contract/Implied Contract Claims* [FN8]

> FN8. Counts I and II have been dismissed by agreement of the parties.

I turn first to the question of Derrig's status and the role of his employment manuals.

1. *At-Will or Contractual Employment Status*

In Count IV, plaintiff argued that he had an express employment contract with defendant Wal-Mart. In the alternative, Count III alleges that the contract was implied-in-fact. [FN9]

> FN9. He argues that his termination constituted breach of an express employment contract as those terms were set out both in initial oral representations to him and in the "Club Manual" he was directed to consult as forming the basis of the terms of his employment. Specifically, plaintiff refers to representations made to him that "employment at Sam's Club was based upon a commitment by the associate-partner to Sam's Club and the commitment by Sam's Club to the associate-partner to act in good faith and consistent with the corporate policies of

Sam's Club ... evidenced to [him] by the express terms and conditions of the Club Manual." Derrig Affidavit, ¶ 6. Alternatively, plaintiff contends that the "Club Manual," and the Associate Handbook insofar as it details the "Open Mind--Open Door Policy" created an implied-in-fact contract on which plaintiff relied and which defendant breached.

*54 Defendant argues that Derrig was an at-will employee and that its decision to terminate his employment was not constrained by any contractual obligations to its employees.

[2][3] Massachusetts law assumes at-will employment, unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment. "An employee at will may be terminated by an employer, without notice, 'for almost any reason at all,' " *GTE Products Corp. v. Stewart*, 421 Mass. 22, 26, 653 N.E.2d 161 (1995), quoting *Jackson v. Action for Community Development*, 403 Mass. 8, 9, 525 N.E.2d 411 (1988). [FN10]

FN10. At-will employees, of course, are still protected from discharge "for asserting a legally guaranteed right ..., for doing what the law requires ..., or for refusing to do what the law forbids...." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 149, 533 N.E.2d 1368 (1989).

[4] The at-will employment doctrine does not govern all cases where an express, written contract has not been entered into by the parties. "[O]n proper proof a personnel manual can be shown to form the basis of such an express or implied contract." *Jackson*, 403 Mass. at 13, 525 N.E.2d 411.

This is a fairly straightforward proposition, however, its application has not been nearly as clear, as the Massachusetts Supreme Judicial Court recently acknowledged. *O'Brien v. New England Telephone & Telegraph Company*, 422 Mass. 686, 691, 664 N.E.2d 843 (1996); *Jackson*, 403 Mass. at 9, 525 N.E.2d 411. [FN11]

FN11. With respect to the confusion, the SJC focused on the factors enumerated in its earlier *Jackson* decision and noted that these factors "have been viewed as constituting a list of conditions that must exist in order to justify a ruling that the terms of a personnel manual are part of an express or implied contract.... The various circumstances discussed in the *Jackson* opinion are not a rigid list of prerequisites, but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." *O'Brien*, 422 Mass. at 692, 664 N.E.2d 843.

In *O'Brien*, the SJC set out to clarify the standard by which to determine whether an employment manual serves, either expressly or impliedly, as a contract. The *O'Brien* Court framed its discussion with an observation: "The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country." *O'Brien*, 422 Mass. at 691, 664 N.E.2d 843. The Court then reinforced the central holding of its earlier *Jackson* case: A personnel manual may form the basis of an express contract, where the parties agree that a personnel manual will spell out the relative rights and obligations of employer and employee; or its terms may be part of an implied contract. While an employer might deny expressly agreeing to contractual obligations, where its conduct is in conformity with procedures set forth in its own manual, an implied-in-fact contract may exist. *Id.* at 692, 664 N.E.2d 843.

The *O'Brien* Court then debunked certain notions that have developed in state and federal court after the *Jackson* decision. The SJC indicated that an absence of contract negotiation does not foreclose the possibility that a contract exists, [FN12] nor does a boilerplate disclaimer with respect to the binding nature of the document. Furthermore, the fact that an employee is not asked to sign the manual and acknowledge its receipt also is not dispositive. And finally, even an employer's express disclaimer may not be sufficient to erase contractual obligations stemming from an employment manual. [FN13]

FN12. The SJC has made an important point: The mere fact that a personnel manual has not been negotiated cannot foreclose a finding that a contract existed, since it is not at all likely that employees will negotiate over such matters, except in a union context. *O'Brien*, 422 Mass. at 692, 664 N.E.2d 843.

FN13. Indeed, in *O'Brien*, the Court noted that even where an employer retained the right unilaterally to modify the terms of the manual, the employee's continued acceptance of employment "would be in the nature of an acceptance of an offer of a unilateral contract ... and the promise would not be illusory."

*O'Brien*, 422 Mass. at 692, 664 N.E.2d 843 (citations omitted). The central question is whether the employee "would reasonably conclude that the employer was presenting the manual as a statement of the conditions under which employment would continue." *Id.*

*55 [5] Instead, the central inquiries are: First, did the employee believe that the employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer? Second, was this belief reasonable under the circumstances? [FN14]

> FN14. It bears emphasizing that the objective prong of this test takes the perspective of the reasonable employee. The SJC reasoned: "Management distributes personnel manuals because it is thought to be in its best interests to do so.... Management expects that employees will adhere to the obligations that the manual has set forth. Courts recently have been reluctant to permit management to reap the benefits of a personnel manual and at the same time avoid promises freely made in the manual that employees reasonably believed were part of their arrangement with the employer. Management voluntarily offers, and defines the terms of, any benefit set forth in its unbargained for personnel manual. The employees may have a reasonable expectancy that management will adhere to a manual's provisions." *O'Brien*, 422 Mass. at 694, 664 N.E.2d 843.

[6] In the case before this Court, defendant alleges that plaintiff Derrig acknowledged that he was an at-will employee and that this fact, above all else, determines the result in this case. Wal-Mart overstates its point. At deposition, Derrig acknowledged that Wal-Mart had not entered into a separate written contract with him as an employee. He further acknowledged that the defendant had not set a specific term of employment nor agreed to pay him certain sums for years to come. After persistent questioning by opposing counsel, he agreed to adopt that attorney's contention that those facts meant that he was an at-will employee. [FN15] The issue is not whether Derrig believed he was an at-will employee, a legal conclusion, but rather whether he believed the terms of the manual to be binding on him and on his employer. It is undisputed that Derrig so believed.

> FN15. The deposition transcript reads as follows:
> DEFENDANT'S COUNSEL: But you didn't have a written contract with Wal-Mart?
> DERRIG: No, nobody does.
> COUNSEL: And you understand that when you don't have a written contract you serve in the capacity of an at-will employee?
> DERRIG: You don't think of it that way as a normal lay person. You guys do because that's your lingo.
> COUNSEL: I'm not asking you to make a legal conclusion about what that means, but you understood that the designation--
> DERRIG: I did not have a contract that said Michael will be hired for the next five years and be paid certain sums.
> COUNSEL: And you knew when you didn't have a contract, that means you're an at-will employee?
> DERRIG: If that's what it means, yes.
> I decline to conclude, from this dialogue, that plaintiff Derrig viewed himself as an at-will employee. The begrudging admission that having no contract setting out a term of employment means that he was an at-will employee came after defendant's counsel had over-stated the conclusion to be drawn. He merely adopted opposing counsel's conclusion, having stated that he didn't think of it in those terms seconds before. While adopting such statements may be ill-advised as a practical matter, it cannot extinguish a claim, in and of itself.

[7] Further, plaintiff's general expectation was not objectively unreasonable. As a matter of form, both the mandatory language and the detail of the Handbook and the Club Manual reasonably suggest their binding nature. As a matter of content, the specific information with respect to attire, hours, training, advancement, discipline,--and indeed possible grounds for termination--set out what any reasonable employee would believe to be binding obligations and certain rights. Finally, as a matter of practice, Wal-Mart itself cites to the Club Manual as the primary reason for its termination of Derrig's employment. An employer may not, on one hand, rely on the mandatory nature of policies it spells out in a manual as the reason for its termination of an employee, and then, on the other hand, deny the contractual force of its manuals when it comes to obligations the document might impose on the employer. [FN16]

> FN16. Defendant points to the disclaimer indicating that the Associate Handbook merely provides guidance and is not legal contract. There is, on the record before me, no such disclaimer in the Club Manual. In any event, Massachusetts law counsels against giving too much weight to one initial

disclaimer contained in the "Welcome" section to the Handbook, in light of the voluminous details of mandatory conduct and promises of treatment and benefits that follow. Indeed, *O'Brien* clarified--and common sense requires--that where employment manuals detail exact expectations of employees and the employer regularly relies on it, the promises made by the employer within the Manual cannot summarily be disregarded. They become equally binding. Accordingly, in this case, Wal-Mart's chatty disclaimer is patently inadequate to off-set Derrig's reasonable expectations that the Club Manual and the Associate Handbook set forth basic terms and conditions of employment.

*56 [8] I therefore find that Derrig's employment was defined by a contract, the terms of which included the policies set forth in the Associate Handbook and the Sam's Club Manual.

*2. Terms of Employment*

This conclusion does not end my inquiry. I must now determine whether the terms of the contract were violated here.

The plaintiff makes three claims: First, he alleges that he did not violate any store policy, since he purchased the tractor for his father, with his father's funds and with his father's card; second, he claims that his discharge was in fact related to a grievance he had lodged against store management, in good faith and relying on the company's "Open Door--Open Mind Policy," as articulated in the "Wal-Mart Associate Handbook"; and third, he states that the termination was in violation of the company's coach and counsel procedure set forth in the Club Manual.

[9] As to Derrig's purchase of Code 2 merchandise, it is plain in the policy that employees such as Derrig are prohibited from purchasing such merchandise. That the tractor was for his father's use and was paid for by his father is not the issue; the policy contains no such limitations on its force. Indeed, when Derrig mentioned his father's wish to purchase the tractor, he reports that his supervisor never told him *his father* could not purchase it. Given the clarity of the policy with respect to the prohibition against employees purchasing Code 2 merchandise, Derrig's purchase of the tractor himself, without his father even being present, constituted a formal violation of the rule.

As to Derrig's charge that Wal-Mart's stated reasons for termination were pretextual and that it acted in violation of its own "Open Door--Open Mind Policy" in its Associate Handbook, Derrig's argument supports the defendant's actions and he offers no evidence to suggest another conclusion. For instance, he comes forward with no comparison cases, in which other employees-- who had made no complaints to Wal-Mart--were allowed to continue their employment in the face of violations of the Code 2 merchandise policy.

Derrig's ultimate argument--that Wal-Mart had an affirmative responsibility to engage in progressive discipline in this case--is also without merit. The policy itself, in its sixth step, provides that "[i]n most cases, all four performance coaching steps will apply to the performance problem. However, based on the severity, the situation may warrant bypassing some or all of the steps." *Id.* at page 5.

Derrig acknowledges that the progressive disciplinary mechanism may be avoided where infractions are viewed as serious. However, he asserts that his infraction, if one existed, was not severe and that it therefore did not warrant bypass of the coaching steps.

I do not agree. As a matter of background, it is clear from Derrig's own memorandum that this was not the first time he had experienced problems. Moreover, the clarity of the Code 2 purchasing policy indicates that violation of its strictures may be viewed as an employee's decision to "abuse" certain discounts, in violation of both the Associate Handbook's rules and the Club Manual. As such, the violation itself, could reasonably be considered "gross misconduct" as the term is used in the Handbook.

In sum, the undisputed facts plainly do not support plaintiff's contention that Wal-Mart violated its binding obligation to this employee in deciding to terminate his employment.

IV. *CONCLUSION*

Based on the foregoing, defendant Wal-Mart's motion for summary judgment is ALLOWED and the instant action is DISMISSED.

942 F.Supp. 49, 132 Lab.Cas. P 58,177, 12 IER Cases 188

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works