UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
DONALD ACHER,                 )
      Plaintiff,              )
                              )      CIVIL ACTION
          vs.                 )      NO. 03-12099-FDS
                              )
FUJITSU NETWORK               )
COMMUNICATIONS, INC.,         )
Defendant,                    )
_____   )
```

ORDER
and
REPORT AND RECOMMENDATION
November 18, 2004

SWARTWOOD, M.J.

Nature of the Proceeding

By Order of Reference dated May 27, 2004, the Motion To Compel Arbitration, Or In The Alternative, To Dismiss Complaint For Failure To State A Claim (Docket No.5) has been referred to me pursuant to 28 U.S.C. §636(b)(1) for disposition on the motion to compel arbitration, and for findings and recommendations on the motion to dismiss the complaint.

Nature of the Case

The Plaintiff, Donald Acher ("Mr. Acher"), has filed suit against Fujitsu Network Communications, Inc., ("FNC"), his former employer, alleging claims for wrongful termination in violation of public policy (Count I), breach of the implied covenant of good

faith and fair dealing (Count II), and breach of contract (Count III).[1]

Facts

Mr. Acher's Employment with FNC

1.    From August 1993 through June 11, 2003, FNC employed Mr. Acher as a Senior Sales Manager for the New England Region. See Verified Complaint And Jury Demand("Complaint"), attached as Exhibit A to the Notice Of Removal Signed Pursuant To Rule 11 (Docket No. 1), at ¶5.

2.    Part of the compensation Mr. Acher received from FNC for his services was a commission which was determined in accordance with a sales incentive plan. Id., at ¶¶ 6,7.  For the period immediately preceding Mr. Acher's termination, the sales incentive plan had been divided into two six month periods: the first period lasted from April 1, 2003 through September 30, 2003 and the second period lasted from October 1, 2003 through March 31, 2004.  Quotas were established for each six month period and commissions were based upon the pre-set quota, total bookings, market penetration and type of product sold during that period. Id., at ¶7.[2]

---

[1]    This action was originally filed in the Massachusetts Superior Court (Worcester Division), but was removed to this Court by FNC pursuant to 28 U.S.C. §§1441, 1332 on the grounds that FNC is not a Massachusetts resident, complete diversity exists between the parties and the matter in controversy exceeds $75,000.

[2]    In Support of its motion to dismiss, FNC has submitted a copy of the Sales Incentive Plan in effect at the time of Mr. Acher's termination. See Affidavit of Douglas Moore (Docket No. 7), at Ex. A (the "Incentive Plan").  Mr. Acher has not challenged the authenticity of the document submitted by FNC as the Incentive Plan.  Because the Incentive Plan is referenced in the Complaint,

2

3.    Specifically, the Incentive Plan in place at the time relevant to Mr. Acher's claim provided that at the beginning of each half period, individual booking quotas would be established for each plan participant, such as Mr. Acher.  The Incentive Plan provided for two distinct types of incentive compensation for plan participants: quota attainment ("QA") and market focus commission ("MF").

4.    In determining a participant's QA compensation, the participant would be "given [credit] for <u>all</u> products and services ... bookings generated during the half". <u>Incentive Plan</u>, at p. 3 (emphasis in original).  A specified dollar value would then be assigned for each performance level obtained and the participants earnings would be "determined by multiplying the quota attainment by the assigned rate for that performance level". <u>Id.</u>

5.    In determining a participant's MF commission, senior management would determine products and/or services which would be designated for that half period's "market penetration efforts". <u>Id.</u> The MF commission rates were determined based on job and territory. <u>Id.</u>

---

inclusion of a copy of this document with FNC's submission does not convert FNC's motion to dismiss into one for summary judgment. <u>See</u> <u>Clorox Co. v. Proctor & Gamble</u>, 228 F.3d 24 (1st Cir. 2000)(in considering motion to dismiss, court "`may properly consider the relevant entirety of document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment'"). Both parties have submitted affidavits which set forth additional facts relevant to Mr. Acher's claim that FNC breached a contract/violated the covenant of good faith and fair dealing by failing to pay him commissions to which he was due.  At this stage of the proceedings, rather than convert FNC's motion to one for summary judgment, in addressing FNC's motion to dismiss, I have included only those facts asserted on the Complaint or contained in the Incentive Plan.

6.    QA and MF compensation/commission were determined based on "bookings", which was defined by the Incentive Plan to be "the net dollar value of all orders received within a given time period. This includes new orders, changes, cancellations, product returns and credit memos ... ." <u>Incentive Plan</u>, at p. 2.

7.    The Incentive Plan provided that:

> At the end of each month, [the participant's] actual performance against quota will be calculated.  In addition, [the participant's] commission will be calculated based on the amount of eligible products/services booked during the month.  Based on the calculations, [the participant] may be eligible to receive a[n] [Incentive Plan] payout.  For the [QA] component, [the participant's] performance to date will be calculated against your fiscal half quota.  Each month, [the participant's QA] attainment payout will be re-calculated, less any amount [the participant] [has] already been paid for that component.

<u>Id.</u>, at p. 6.

8.    The Incentive Plan's rules concerning eligibility provided that upon termination, a participant's compensation/commissions would be determined as follows: "QA component pro-rated based on time with the company and based on performance as of last day worked.  MF component paid based on MF-eligible bookings generated from beginning of fiscal half to last day worked". <u>Id.</u>, at p. 7.

9.    As of the date of his termination, Mr. Acher believed he had achieved fifty percent (50%) of the first period's quota. <u>Id.</u>, at ¶8.

10.    Mr. Acher's primary account was Verizon Communications, Inc. ("Verizon").  The Verizon account was divided into two

components: the interoffice facility account ("IOF") and the outside plant account ("OSP"). Id., at ¶10. Over the ten year period that Mr. Acher oversaw the Verizon account, FNC had one hundred percent (100%) of the market share of the Verizon IOF account and approximately seventy percent (70%) of the market share of Verizon's OSP account in the New England region. Complaint, at ¶11.

11.  Verizon requires all of its vendors to adhere to Network Equipment Building Systems ("NEBS") standards, which are intended to ensure that equipment and systems provide reliable service when less than ideal conditions are present without disrupting other services provided by nearby carriers or third party owned equipment and without posing undue safety risks and hazards. Id., at ¶20.

12.  In 2002, FNC began working on a proposal for a telecommunications hardware system: Flashwave 4000 Series Next Generation Sonet ("Flashwave"). Id., at ¶12.

13.  In the Fall of 2002, Doug Moore, Vice President of Sales for FNC, indicated that he wanted FNC to increase its market share with Verizon, particularly in the New York region and in the New England region relating to the OSP account. As part of this plan, Mr. Moore indicated that he would propose that Verizon remove any competitive hardware that could be utilizing valuable floor space for potential FNC equipment. Id., at ¶¶ 13,14.

14.  Mr. Acher discussed the removal of competitor's hardware with Henry Gamsby, Director of Verizon-Massachusetts' OSP.  Mr. Gamsby indicated that Verizon would be willing to retire such equipment, but not remove it for one to two years. Id., at ¶15.

15.  Mr. Acher relayed Mr. Gamby's position to Mr. Moore.  Mr. Moore indicated that he did not believe that retiring FNC's competitor's equipment would address FNC's need to expand market share. Id., at ¶16.

16.  In January 2003, a sales conference was held, which was attended by, among other FNC personnel, Messrs. Acher and Moore.  During this conference, in an attempt to secure 100% market share of the Verizon account in New York and the OSP account in New England, Mr. Moore was requiring that the proposal submitted to Verizon for purchase of the Flashwave include a requirement that FNC's competitor's hardware be destroyed, removed or rendered inoperable.  Id., at ¶¶17-18.

17.  At this time and later in related conference calls, Mr. Acher voiced his concerns about that part of the proposal which would require that competitor's hardware be destroyed, removed and, in particular, rendered inoperable. Id., at ¶19.

18.  The reason Mr. Acher questioned Mr. Moore's proposal was his concerns about the impact on the integrity of Verizon's NEBS. Id., ¶19.

19.  After much discussion, Mr. Moore's plan to have competitor's equipment removed, destroyed or rendered inoperable was deleted from the Verizon proposal. Id., at ¶21.

20.  Over the next several months, Mr. Acher made numerous presentations to Verizon management concerning the Flashwave. Prior to April 8, 2003, Mr. Acher's presentations did not address the removal, destruction or rendering inoperable of FNC's competitor's equipment.  However, on April 8, 2003, Mr. Acher was accompanied to a Verizon sales presentation by William Lewis, Director of FNC's New York/New England Sales.  Mr. Lewis indicated to Verizon representatives that Mr. Acher had worked very hard to keep out of  the proposal a provision requiring the damaging of "Lucent Shelves". Id., at ¶23.

21.  Verizon representatives were puzzled by Mr. Lewis's remark and Mr. Acher was shocked by the remark. Id., at ¶24.

22.  In May 2003, Verizon accepted FNC's proposal regarding Flashwave. Id., at ¶25.

23.  On June 11, 2003, FNC, without warning, terminated Mr. Acher.  FNC did not give any specifics or explanations for Mr. Acher's termination other than Mr. Lewis's remark that "the way you run the account, we need to part company". Id., at ¶26.

<u>The Arbitration Policy</u>

24.  In 1994, FNC adopted an arbitration policy and circulated it to all employees, together with an explanatory memorandum dated

7

September 22, 1994.  With minor revisions, that same arbitration policy remains in effect. <u>Affidavit of Melanie Scofield</u> (Docket No. 6) ("<u>Scofield Aff.</u>"), at ¶3, <u>Ex. A</u> (FNC's arbitration as revised through January 24, 2000)(the "Policy")[3], <u>Ex. B</u> (memorandum dated September 22, 1994)("September 22, 1994 Memorandum").

25.  The Policy requires that:

> Any dispute between an employee and FNC arising out of the employee's employment with the Company or its termination, including without limitation any claim of wrongful termination, breach of implied contract, discrimination, unlawful harassment, including sexual harassment, breach of covenant of good faith and fair dealing, violations of public policy, or any federal or state law, or as to all the preceding, any related claims of defamation, or infliction of emotional distress, which are not resolved by the Company and employee through direct discussion or mediation, will be submitted exclusively to final and binding arbitration in accordance with Company's Arbitration Procedures... .

<u>Policy</u>, at ¶1.1.

26.  The September 22, 1994 Memorandum states that the Policy would be effective October 1, 1994 for all new employees, and April 1, 1995 for then current employees of FNC.  The memorandum went on to inform current employees of FNC that the arbitration policy and procedures were available for review in the Human Resources Department, and that explanatory presentations would be held for all employees. <u>September 22, 1994 Memorandum</u>.

---

[3]     FNC has provided this Court with a copy of the second revised edition of the arbitration policy which was originally issued on October 14, 1994.  FNC has represented that since the arbitration policy was initially issued, it has been modified only as necessary to reflect new developments in the law.  <u>See Scofield Aff.</u>, at ¶6.

8

27.  Mr. Acher never received a copy of the Policy or the September 22, 1994 Memorandum, nor was he ever asked to sign an acknowledgment that he was aware of or agreed with the Policy. <u>Acher Affidavit</u> (Docket No. 10)("<u>Acher Aff.</u>"), at ¶¶5,6.

28.  Starting in 1998, FNC began posting the Policy on its intra-company intranet website.  Mr. Acher, as an FNC employee, had access to this website.  FNC charges its employees with awareness of the information posted on its intranet website. <u>Reply Affidavit Of Melanie Scofield</u> (Docket No. 16), at ¶¶ 2,3.

29.  Due to software and other technical problems, Mr. Acher did not have access to FNC's intranet website until on or about 1999.  Although Mr. Acher had access to FNC's intranet website, he spent little time utilizing it and when he did use it, he never saw the Policy. <u>Supplemental Affidavit Of Donald Archer</u> (Docket No. 18), at ¶¶ 2-4.

30.  The first time that Mr. Acher became aware of the existence of the Policy was after his termination in June 2003. <u>Id.</u>, at ¶4; <u>Acher Aff.</u>, at ¶9.

<u>FNC's Motion To Compel Arbitration</u>

<u>Discussion</u>

The Federal Arbitration Act, 9 U.S.C. §§1-18 (the "Act") is applicable to any arbitration agreement which falls within its coverage.  The purpose behind the Act is to lessen the caseload of the courts, while providing parties with a speedier and lest costly

method for settling disputes.  In order to achieve the Act's goals, federal courts rigorously enforce the Act's policy of favoring arbitration.  "Nevertheless, arbitration is a matter of contract…and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." <u>AT&T Techs., Inc. Communications Workers of America</u>, 475 U.S. 643, 648 (1986)(citing <u>United Steelworkers v. Warrior Gulf Navigation Co.</u>, 363 U.S. 574, 582 (1960)).  Therefore, before compelling a party to arbitrate, the court must first determine whether there exists a valid agreement to arbitrate and whether the claims asserted fall within the scope of the arbitration agreement.[4]

There can be no question that the Policy, if binding on Mr. Acher, would require him to arbitrate the claims he has asserted against FNC in his Complaint and Mr. Acher does not argue to the contrary.  Therefore, I will focus on whether an enforceable arbitration agreement exists between Mr. Acher and FNC.

FNC argues that Mr. Acher had actual or constructive notice of the Policy when it was: circulated to all FNC personnel on September 22, 1994, together with the explanatory September 22, 1994 Memorandum; and/or posted on FNC's intranet website.  FNC

---

[4]    FNC asserts that it is a business engaged in interstate commerce, an assertion which Mr. Acher does not contest.  Furthermore, Mr. Acher does not take the position that he is a worker "`"actually engaged in the movement of goods in interstate commerce"'", in which case, any agreement to arbitrate between he and FNC would be excluded from the Act. <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 113, 121 S.Ct. 1302 (2001)(citation to quoted case omitted).  Under these circumstances, the determination of whether a valid arbitration agreement exists between the parties is governed by the Act.

further argues that Mr. Acher agreed to be bound by the Policy when he continued to work for FNC after having being notified of the Policy.  Mr. Acher asserts that: he never received a copy of the Policy or the September 22, 1994 Memorandum; he was never aware of the Policy; and he never saw the Policy on FNC's intranet website or even knew that the Policy could be found on the website.  Mr. Acher then argues that since he did not have notice of the Policy, he never agreed to be bound by it and therefore, cannot be compelled to submit to arbitration.

The issue of whether the parties had a valid agreement to arbitrate is governed by "general principles of state contract law".  See Campbell v. General Dynamics Gov't System Corp., 321 F.Supp.2d 142, 146 (D.Mass. 2004).  The party seeking to compel arbitration, in this case FNC, has the burden of proving, by a preponderance of the evidence, the existence of a valid and binding agreement to arbitrate.  Intergen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003); see also Johnson v. Long John Silver's Restaurants, Inc., 320 F.Supp.2d 656, 664 (M.D.Tenn. 2004).

"Under Massachusetts law, a valid contract requires offer, acceptance, and consideration."  Campbell, 321 F.Supp.2d 147 n.3 (D. Mass. 2004) (citing City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 716 N.E.2d 138 (1999)); See also, Secretary of Admin. v. Mass. Org. of State Engineers and Scientists, 408 Mass. 837, 839 (1990)("the question of arbitrability...depends on whether

the parties expressed an intention to arbitrate"). It is undisputed that Mr. Acher never signed an agreement to arbitrate any claims arising out of his employment with FNC. However, in some cases, most typically where arbitration agreements have been mailed to employees, circulated to employees in an employee handbook or with an accompanying memorandum, or distributed to employees at an explanatory meeting, "continuing to work *with the knowledge* that a dispute resolution policy is a mandatory condition of continued employment can constitute acceptance (and the continued employment, consideration)". Id. and cases cited therein (emphasis added).

As stated previously, FNC asserts that it provided it employees, including Mr. Acher, notice of the Policy first, by providing employees copies of the agreement together with a detailed explanatory memorandum that clearly articulated the substance and purpose of the Policy. Additionally, in 1999, the Policy was made available for viewing on FNC's internal website, to which Mr. Acher had access. Mr. Acher, on the other hand, has submitted two affidavits, signed under the pains and penalties of perjury, averring that prior to his termination: he had never received a copy of the Policy, never accessed the Policy on FNC's internal website (indeed, he never knew that the Policy could be found on the website) and was not aware that the Policy existed until after his termination.

12

FNC, which bears the burden of proof on this issue has not proffered: any evidence, such as a signed acknowledgment, that Mr. Acher actually received the Policy and accompanying September 22, 1994 Memorandum; any evidence, such as a sign in sheet, that Mr. Acher attended any meeting(s) at which the Policy was distributed and/or discussed; or any evidence either that Mr. Acher was advised that the Policy could be found on FNC's internal website, or that he had accessed the Policy on the website. Furthermore, with respect to FNC's position that Mr. Acher can be charged with notice of the Policy since it was found on its internal website, FNC has not proffered any evidence which would establish that its employees were notified that the Policy was posted on its intranet website, nor has it submitted any evidence which would establish that employees had been informed that they were charged with knowledge of policies contained on the company's intranet website. Under these circumstances, I cannot find that Mr. Acher ever received notice of the Policy and therefore, FNC has failed to meet its burden to establish that there was an "agreement" to arbitrate between the parties. Therefore, FNC's motion to compel is denied.

<u>FNC'S Motion To Dismiss</u>

<u>Standard of Review</u>

FNC has filed a motion to dismiss Mr. Acher's Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. A motion to dismiss will be granted only if after "taking the

allegations in the complaint as true and making all reasonable inferences in favor of [the] plaintiff[,] ... `it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation'". <u>Doran v. Massachusetts Turnpike Auth.</u>, 348 F.3d 315, 318 (1st Cir. 2003)(citation to quoted case omitted).

<u>Wrongful Termination In Violation Of Public Policy</u>

Mr. Acher claims that he was terminated for opposing a proposal made by his supervisor that Verizon be required to remove, destroy and/or disable competitor's equipment as a condition to purchasing Flashwave.  For purposes of this discussion, I will assume that Mr. Acher was, in fact, fired for opposing such proposal.  Mr. Acher asserts that his termination violated public policy because the removal, destruction or disabling of competitor's equipment would impair Verizon's ability to comply with NEBS standards, which Mr. Acher asserts are incorporated into federal regulations and therefore, have the force of law[5].  FNC

---

[5]     "NEBS standards were developed by Bell Labs in the 1970's to standardize equipment ... installed" by telecommunications carriers in their central offices. Dave Lorusso, <u>NEBS Certification Design With The Customer In Mind</u>, Conformity (October 2002), at <u>http://www.conformity.com.</u>  The primary purpose behind the NEBS stadards is "to make network switches bulletproof ... Telephone companies ... rely almost entirely on NEBS compliant hardware for their central office telephone network switching.  Doing so assures them that the equipment they buy meets clearly identified standards regarding temperature and humidity, resistance to fire, equipment handling, earthquake survivability, vibration (both in the office and when being transported), airborne contaminants an acoustic noises". NEBS (Network Equipment Building System), at <u>http://www.nwfusion.com.</u>  Frankly, it is questionable whether FNC's proposal would violate NEBS or the regulations cited by Mr. Acher.  Under Massachusetts law, Mr. Acher could still establish that his termination violated public policy so long as he could establish that he believed that FNC's proposal violated state or federal regulations, *so long as such belief was reasonable*.  For purposes of

14

argues that accepting Mr. Acher's allegations as true, he has failed to state a claim because it involved an internal complaint about the handling of an internal company matter.

Mr. Acher was an at-will employee.  Under Massachusetts law, an "at-will employee may be terminated at any time for any reason or for no reason at all". <u>Upton v. JWP Businessland</u>, 425 Mass. 756, 757, 682 N.E.2d 1357 (1997).  However, Massachusetts law protects at-will employees from being terminated for reasons which violate public policy.  Thus, an employee may not be terminated "for asserting a legally guaranteed right ... , for doing what the law requires ..., or for refusing to do what the law forbids ... ". <u>Falcon v. Leger</u>,  62 Mass.App.Ct. 352, --N.E.2d--, (2004).  For example, an employee may "be shielded from the risk of discharge if he or she reasonably, but perhaps erroneously, reports that an employer is violating State and municipal law and ordinances concerning public safety". <u>Id.</u>, at --, --N.E.2d--.  However, this public policy exception does not protect employees fired for complaining about internal company policies or rules. <u>Id.</u>

Mr. Acher cites the recent Massachusetts Appeals Court decision in <u>Falcon</u> as supporting his position that since FNC's proposal could have interfered with public safety, his termination for opposing such proposal violated public policy.  In <u>Falcon</u>, the

---

this Report and Recommendation, I will accept Mr. Acher's contention that the NEBS standards have been incorporated into federal regulations and that FNC's proposal would violate such regulations.

plaintiff, who worked for a company that manufactured wire and cable, was found to have been terminated for refusing to comply with a supervisor's order to lie to an inspector from Underwriter's Laboratory ("UL") concerning the whereabouts of wire products she had found to be non-conforming on two prior inspection visits (plaintiff's employer was required to comply with UL standards in order to obtain UL certification for its products. Such certification serves as notice that the products meet specified standards and therefore, are safe for their intended purpose. Wire that conformed to UL standards was shipped with a UL label affixed to it. Plaintiff's supervisor intended to affix UL labels to the non-conforming wire and ship it to a customer. See Id.) However, Mr. Acher's circumstances are readily distinguishable from the plaintiff's in Falcon.

In this case, FNC was not seeking to conceal from Verizon its intention that upon purchasing Flashwave, Verizon would be required to remove, destroy and/or disable FNC's competitor's equipment. On the contrary, Mr. Acher's supervisor was insisting that Mr. Acher inform Verizon that this proposal was a condition of purchasing Flashwave. Verizon, not FNC, required that products it purchased comply with NEBS standards. If Verizon felt that such proposal would violate any laws or regulations or quality standards with which it was required to comply, it presumably would, and in this

case did, reject the proposal.[6]   Under these circumstances, Mr.
Acher cannot establish that FNC's proposal put the consumer in
harms way or threatened the public safety.  Therefore, I find that,
as a matter of law, Mr. Acher cannot state a claim for wrongful
termination in violation of public policy.

 Breach of The Implied Covenant of Good Faith; Breach of Contract

     Mr. Acher asserts that after his termination, FNC failed to
pay him all of the compensation/commissions which he was due and
that such failure constitutes both a breach of the implied covenant
of good faith and fair dealing and breach of contract.   FNC
acknowledges    that    Mr.    Acher    was    entitled    to
compensation/commissions pursuant to the Incentive Plan.  However,
FNC asserts that since Mr. Acher's Complaint alleges that FNC
failed to pay him compensation/commissions earned on sales which
occurred after his termination rather than alleging that FNC failed
to pay him compensation/commissions he had already earned at the
time of his termination, as a matter of law, he has failed to state
a claim for violation of the implied covenant of good faith and
fair dealing.  FNC further argues that the Incentive Plan expressly
provides    that    a    participant    is    not    entitled    to    earn
compensation/commissions    after    termination    of    employment    and
therefore, it could not have breached any agreement with Mr. Acher

---

     [6]     Had FNC proposed to remove, destroy and/or disable competitor's
equipment when installing Flashwave without notifying Verizon of its intent to
do so, then this case might be analogous to <u>Falcon</u>.

by failing to pay him commissions for sales which occurred after his termination.

As discussed previously, as an "at will" employee, Mr. Acher could be terminated at any time without reason.  However, "Massachusetts courts ... have long held that the general at-will employment rule is `subject to certain limited exceptions where a covenant of good faith and fair dealing may be implied'". <u>Hunt v. Wyle Lab.'s, Inc.</u>, 997 F.Supp. 84, 90 (1997).  The "good faith and fair dealing" exception protects:

> the employee where the termination decision was taken in "bad faith" in order to deprive the employee of compensation for past services due or forthcoming at the time s/he was discharged ... . [A] second line of cases ... shield[s] the employee where the termination decision was not taken in bad faith, but without "good cause," resulting in a deprivation of "reasonably ascertainable future compensation" based on past services ... .

<u>Id.</u> (internal citations and citation to quoted cases omitted).

Mr. Acher has alleged that while he was employed by FNC, Verizon accepted a proposal to purchase additional FNC equipment. Mr. Acher further alleges that after his termination, Verizon completed the purchase of such equipment and therefore, he is entitled to compensation/commissions on those equipment sales.  FNC argues that Mr. Acher does not fit into either of the Massachusetts line of cases because he is seeking compensation/commissions which he would have earned had he remained employed by FNC, rather than compensation/commissions he was due as a result of work he had already performed by FNC.

The Incentive Plan expressly provides that upon termination, the QA component to which the employee would be entitled would be "pro-rated based on time with the company and based on performance as of last day worked" and the MF component would be "paid based on MF-eligible bookings generated from beginning of fiscal half to last day worked". <u>Incentive Plan</u>, at p. 7.  It appears from Mr. Acher's submissions that he may have either misread the terms of the Incentive Plan, or failed to understand the provision of the Incentive Plan which applies in the event of his termination. However, it is undisputed that under the Incentive Plan, Mr. Acher was entitled to some amount of compensation/commission at the time of his termination.  Mr. Acher has alleged that he has not received the amount of compensation/commission to which he was due in accordance with the Incentive Plan.  As the record stands, it unclear how much compensation/commission was due Mr. Acher at the time of his termination in accordance with the express terms of the Incentive Plan and whether Mr. Acher did in fact receive the appropriate compensation/commission amount.   Under these circumstances, I cannot find as a matter of law, that there are no set of circumstances under which Mr. Acher could recover against FNC for violation of the implied covenant of good faith and fair dealing or for breach of contract.  Therefore, FNC's motion to dismiss Counts II and III of the Complaint should be denied.

## Conclusion

Fujitsu Network Communications, Inc. has filed a Motion to Compel Arbitration Or, In The Alternative, Dismiss Complaint For Failure To State A Claim (Docket No. 5).

It is hereby Ordered that:

1.    The motion to compel arbitration is <u>denied</u>.

It is hereby recommended that:

2.    The motion to dismiss the Complaint for failure to state a claim should be <u>allowed</u> as to Count I (wrongful termination in violation of Public Policy) and <u>denied</u> as to Counts II (breach of the implied covenant of good faith and fair dealing) and Count III (breach of contract).

## Notice to Parties

The parties are advised that under the provisions of Rule 3(b) of the Rules for the United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of those proposed findings, recommendations, or report to which objection is made and the basis of such objection. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude

further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. See <u>United States v. Valencia-Copete</u>, 792 F.2d 4 (1st Cir. 1986); <u>Scott v. Schweiker</u>, 702 F. 2d 13, 14 (1st Cir. 1983); <u>United States v. Vega</u>, 678 F.2d 376, 378-379 (1st Cir. 1982); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 60(1st Cir. 1980).  See <u>also</u>, <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985).


<u>/s/ Charles B. Swartwood III</u>
CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE

21