UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD ACHER, <br><br> *Plaintiff,* <br><br> v. <br><br> FUJITSU NETWORK COMMUNICATIONS, INC. <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 03-12099 (FDS) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED STATEMENT OF MATERIAL FACTS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56(b) defendant, Fujitsu Network Communications, Inc. ("FNC"), hereby submits this Motion for Summary Judgment, with incorporated Statement of Material Facts and incorporated Memorandum of Law, seeking judgment on Counts II and III of the Complaint of Donald Acher ("Acher"). In support of this Motion, FNC submits herewith the Affidavit of Douglas Moore ("Moore Affidavit"), which details how Acher has been paid in full for all amounts of money he can claim as damages in Counts II and III of his Complaint.

Judgment should enter in favor of FNC at this time.

### BACKGROUND

On October 17, 2003, Acher filed a three count Complaint alleging that FNC terminated his employment on June 11, 2003 in violation of public policy (Count I) and failed to pay him commissions due. For commissions allegedly due, Acher brought claims for breach of the implied covenant of good faith and fair dealing (Count II) and breach of contract (Count III).

In response to Acher's Complaint, FNC moved to compel arbitration or, alternatively, to dismiss his claims pursuant to Fed. R. Civ. P. 12(b)(6). The Court referred FNC's motion for resolution by a Magistrate Judge.

On November 18, 2004, the parties received the Order and Report and Recommendation of Magistrate Judge Swartwood ("Order and Report") recommending that Count 1 of Acher's Complaint for termination in violation of public policy be dismissed, but recommending the denial of FNC's motion for dismissal of Acher's claim for unpaid commissions in Counts II and III.[1] As for Counts II and III, the Order and Report provided:

> Mr. Acher asserts that after his termination, FNC failed to pay him all of the compensation/commissions which he was due and that such failure constitutes both a breach of the implied covenant of good faith and fair dealing and breach of contract. FNC acknowledges that Mr. Acher was entitled to compensation/commissions pursuant to the Incentive Plan. However, FNC asserts that since Mr. Acher's Complaint alleges that FNC failed to pay him compensation/commissions earned on sales which occurred after his termination rather than alleging that FNC failed to pay him compensation/ commissions he had already earned at the time of his termination, as a matter of law, he has failed to state a claim for violation of the implied covenant of good faith and fair dealing. FNC further argues that the Incentive Plan expressly provides that a participant is not entitled to earn compensation/commissions after termination of employment and therefore, it could not have breached any agreement with Mr. Acher by failing to pay him commissions for sales which occurred after his termination.

> *        *        *

> Mr. Acher has alleged that while he was employed by FNC, Verizon accepted a proposal to purchase additional FNC equipment. Mr. Acher further alleges that after his termination, Verizon completed the purchase of such equipment and therefore, he is entitled to compensation/commissions on those equipment sales. FNC argues that Mr. Acher does not fit into either of the Massachusetts line of cases because he is seeking compensation/commissions which he would have earned had he remained employed by FNC, rather than compensation/commissions he was due as a result of work he had already performed by FNC.

> The Incentive Plan expressly provides that upon termination, the QA component to which the employee would be entitled would be "pro-rated based on time with the

---

[1]    The Order and Report also recommended the denial of FNC's Motion to Compel Arbitration and FNC did not object to that recommendation.

company and based on performance as of last day worked" and the MF component would be "paid based on MF-eligible booking generated from beginning of fiscal half to last day worked." Incentive Plan, at p. 7. **It appears from Mr. Acher's submission that he may have either misread the terms of the Incentive Plan, or failed to understand the provision of the Incentive Plan which applies in the event of his termination.** However, it is undisputed that under the Incentive Plan, Mr. Acher was entitled to some amount of compensation/commission at the time of his termination. Mr. Acher has alleged that he has not received the amount of compensation/commission to which he was due in accordance with the Incentive Plan. **As the record stands, it is unclear how much compensation/commission was due Mr. Acher at the time of his termination in accordance with the express terms of the Incentive Plan and whether Mr. Acher did in fact receive the appropriate compensation/commission amount.** Under these circumstances, I cannot find as a matter of law, that there are no set of circumstances under which Mr. Acher could recover against FNC for violation of the implied covenant of good faith and fair dealing or for breach of contract. Therefore, FNC's motion to dismiss Counts II and III of the Complaint should be denied.

On November 24, 2004, Acher filed an objection to that portion of the Order and Report that recommended dismissal of his public policy claim in Count I of his Complaint. On December 3, 2004, FNC filed its response to Acher's objection. By Memorandum and Order dated January 26, 2005 ("Order"), the Court held:

> Upon *de novo* review, the Court adopts the Report and Recommendation of the Magistrate Judge in its entirety.

(See Order, at 2)

The Moore Affidavit, submitted herewith, demonstrates that judgment may now enter in favor of FNC on Counts II and III of Acher's Complaint. Specifically, there is no material dispute of fact on Acher's claim for commissions due to him as of his termination date (i.e., June 11, 2003). Acher has been paid in full for any such commissions due to him and his remaining claims are moot.

## STATEMENT OF MATERIAL FACTS
## TO WHICH THERE IS NO GENUINE DISPUTE

### I.    Background

1.    Acher worked for FNC as a Senior Sales Manager from August 1993 to June 11, 2003. (See Moore Affidavit, ¶ 1)  In his position, Acher was in the reporting structure of Douglas Moore ("Moore"), in Moore's then position as FNC's Vice President of Sales. (Id.)  In his position, Acher was responsible for the New England District. (Id.)  In connection with his employment, Acher received a base salary, and he could be paid monthly incentives under FNC's incentive plan. (Id.)

2.    FNC's fiscal year ran from April 1st to March 31st. (See Moore Affidavit, ¶ 2)  FNC's sales incentive plans were regularly updated and applicable to fiscal half-years. (Id.)  Thus, the sales incentive plan in existence at the time of Acher's termination – .e. for the first half of 2003 -- extended from April 1, 2003 to September 30, 2003. (Id.)  A true and correct copy of that incentive plan is attached at Tab 1 to the Moore Affidavit ("Plan").

3.    There were two primary types of incentives Acher could earn under the Plan: one based on Quota Attainment ("QA") and one based on Market Focus ("MF"). (See Moore Affidavit, ¶ 3)  Both types of incentives were paid based on "bookings," defined as "the net dollar value of all **orders received** within a given time period." (Id. (emphasis added))

4.    For the MF component, each fiscal half, FNC aimed to increase the market penetration of certain products and/or services. (See Moore Affidavit, ¶ 4)  To incentivize Acher (and others) in this effort, FNC paid a commission of .00478 for each $1 in MF eligible bookings generated. (Id.)  Eligible bookings were for the products and/or services that were designated at the start of the fiscal half year as part of the MF program. (Id.)  Those products or services which were part of the MF program in the first half of 2003 are in the Table attached at Tab 2 to the

4

Moore Affidavit. (Id.) Pertinent to Acher's bookings and MF commissions, detailed below, MF eligible products included the FNC's Flashwave 4100, 4300 and 4500 products and certain so-called "Management Products." (Id.)

5.      For the QA component, FNC gave Acher a "quota" of bookings to achieve for the first half of 2003. (See Moore Affidavit, ¶ 5) Acher's quota for the first half of 2003 was $8 million. (Id.) Page 3 of the Plan contains a Table which shows how Acher (and others) would be paid depending on his percentage achievement of that quota. (Id.) For example, if by the end of April 2003, Acher had booked 30% of the $8 million quota (or $2.4 million), he would be paid $70 for every 1 percent achieved, or $2,100. (Id.) If, by the end of May 2003, Acher booked another $2.4 million worth of equipment, he would then have achieved 60% of his quota ($4.8 million/$8 million). (Id.) He would thus be paid $100 for every 1% achieved, less amounts already paid. (Id.)

6.      All of Acher's bookings, including bookings of MF designated products, would count toward the QA component of the Plan. (See Moore Affidavit, ¶ 6) Acher's bookings were tallied by including:

> (i)      100% of all direct orders originating in New England;
>
> (ii)     For the first two months of the half year (April/May, 2003), 100% of the Plug-in-Card ("PIC") bookings on Flashwave ("FW") 4000 series and management products (e.g., software to manage the equipment) in the Northeast.
>
>> NOTE: FW 4000 was new to Verizon in April 2003. Verizon was in a trial period with the products, called a First Office Application ("FOA"). Thus, while the FOA was in progress, Acher got 100% credit for Verizon bookings on any PICS FW 4000 series products in the Northeast territory. When the FOA ended in late May, Acher resumed receiving a 28% allocation of such bookings, see (iii) infra); and
>
> (iii)    28% of the PICS not already allocated as per (ii) above and booked through the PICS warehouse in Southborough, MA (this 28% was based on an allocation which recognized that the PICS booked through this warehouse were

usable through the Northeast and the New England region was deemed to represent 28% of the Northeast).

(Id.)

7.     Under the Plan, Acher could not earn either QA or MF incentives on bookings that occurred after his date of termination. (See Moore Affidavit, ¶ 7)

8.     As the Plan provided, both QA and MF incentives were to be pro-rated and paid through **"the last day worked."** (Id. ¶ 8 (emphasis added)) Acher's last day worked was June 11, 2003 ("Termination Date"). (Id.; see also Complaint, ¶ 26)

## II.    FNC Makes All MF and QA Incentive Payments To Acher

9.     After his Termination Date, FNC made various payments to Acher for: **(a)** his MF incentives on bookings in April 2003 (Acher was not entitled to any QA incentives for April 2003); **(b)** his MF and QA incentives for May 2003; and **(c)** his MF and QA incentives for eligible bookings up to June 11, 2003. (See Moore Affidavit, ¶ 9) A table summarizing all of these payments and the calculations which supported them is attached at Tab 3.A to the Moore Affidavit. Evidence of such payments to Acher is attached at Tab 3.B to the Moore Affidavit. Set forth below is an explanation of the information in Tabs 3.A and 3.B.

### (a)    April 2003

10.    A $506.20 payment was made by direct deposit to Acher on June 13, 2003. (See Moore Affidavit, ¶ 10)

11.    This payment was based on MF bookings only. (Id. ¶ 11) Specifically, there were a total of $105,899.01 in MF qualified bookings in April 2003, for which Acher was given 100% credit (see Paragraph 6(ii), supra):

FW 4100:  $28,000.01
FW 4300:  $67,646.00
FW 4500:  $10,253.00

Total:          $105,899.01

(Id.) As set forth on Page 3 of the Plan, this $105,899.01 was multiplied by .00478 to calculate

Acher's MF commission for April:  $105,899.01 x .00478 = $506.20. (Id.)

12.     Acher had bookings in April toward the QA component of the P an but, as set

forth below, his bookings amounted to only 15% of his $8 million quota (or $1,199,422.90).

(See Moore Affidavit, ¶ 12)  The $1,199,422.90 was calculated pursuant to the allocations set

forth in Paragraph 6 above as follows:

| | |
|---|---|
| 100% of bookings in New England: | $9,279.61 |
| 100% of PICS bookings on FW 4100, 4300 and 4500 in the Northeast (see Paragraph 6(ii), supra): | $105,899.01 |
| 28% of the remaining PICS bookings in the Northeast: | $1,084,244.28 |
| Total: | $1,199,942.90 |

(Id.) Under the Plan, Acher could not begin receiving a QA incentive until he achieved 25% or

greater of his $8 million quota. (Id.)  As such, there was no QA commission due to Acher for

April 2003. (Id.)

**(b)     May 2003**

13.     A $3,095.41 payment was made by direct deposit to Acher on June 27, 2003. (See

Moore Affidavit, ¶ 13)[2]

14.     As set forth Tab 3.A to the Moore Affidavit, this payment had a $505.41 MF

component and a $2,590.00 QA component. (See Moore Affidavit, ¶ 14; see also Note 2, supra)

_____

[2]     This $3,095.41 payment, together with a separate $805.54 payment described in
Paragraph 26, infra), was part of one check, totaling $3,900.95. (See Moore Affidavit,
Tab 3.B)

15.     For the MF component, there were a total of $105,735.01 in MF qualified bookings in May 2003 for which Acher received 100% credit (see Paragraph 6(ii), supra):

| | |
|---|---|
| FW 4100: | $3,126 |
| FW 4300: | $28,552 |
| FW 4500: | $74,057.01 |
| Mgmt Products: | $.01 |

Total:          $105,735.02

(See Moore Affidavit, ¶ 15)  As set forth on Page 3 of the Plan, this $105,735.02 was multiplied by .00478 to calculate Acher's MF commission for May:  $105,735.02 x .00478 = $504.41. (Id.)

16.     For the QA component, in May 2003, Acher achieved an additional 22% of his $8 million quota as follows:

| | |
|---|---|
| 100% of bookings in New England: | $8,341.46 |
| 100% of PICS bookings on FW 4100, 4300 and 4500 in the Northeast (see Paragraph 6(ii), supra): | $105,735.02 |
| 28% of the remaining PICS bookings in the Northeast: | $1,668,792.12 |
| Total: | $1,782,868.60 |

(See Moore Affidavit, ¶ 16)  Adding that $1,782,868.60 total to the 15% (or $1,199,422.61) Acher booked in April 2003, Acher's total percentage QA achievement by the end of May 2003 was 37%. (Id.)  As such, pursuant to the Table on Page 3 of the Plan, Acher's QA incentive component was 37 x $70, or $2,590. (Id.)

**(c)     June 1, 2003 – June 11, 2003**

17.     A $2,590.96 payment was made by direct deposit to Acher on July 25, 2003. (See Moore Affidavit, ¶ 17)  This payment had an MF component of $80.96 and a QA component of $2,510.00. (Id.)

18.     For the MF component, there were a total of $60,487.08 in MF qualified bookings from June 1-June 11, 2003:

| FW 4100: | N/A |
| FW 4300: | $9,250 |
| FW 4500: | $43,237.08 |
| Mgmt Products: | $8,000 |
| | |
| Total: | $60,487.08 |

(See Moore Affidavit, ¶ 18)  However, as set forth in Paragraph 6(ii) above, Acher was not

entitled to 100% credit for these bookings (as he was in April and May), but rather the standard

28% allocation to New England. (Id.)  Multiplying 28% by $60,487.08, Acher's total MF

bookings from June 1-June 11, 2003 was $16,936.38. (Id.)  Pursuant to the Plan, this $16,936.38

figure was multiplied by .00478, which equaled $80.96. (Id.)

19.    For the QA component, from June 1-June 11, 2003, Acher achieved an additional

14% of his $8 million quota as follows:

| 100% of bookings in New England: | | $142,851.84 |
| 28% of the PICS bookings | | |
| in the Northeast: | | $933,565.74 |
| | Total: | $1,076,417.58 |

(See Moore Affidavit, ¶ 19)  Adding Acher's QA totals from April, $1,199,422.61, and May,

$1,782,868.59, to the June total above, he now had a QA total of $4,058,708.78. (Id.)  This

represented 51% of his $8 million quota. (Id.)  Pursuant to the Table on Page 3 of the Plan,

Acher now could be paid a QA incentive of $100 for every percentage achieved, or $5,100. (Id.)

20.    As the Plan provided, "Each month, [participants'] quota attainment will be re-

calculated, less any amount [the participant has] already been paid for that component." (See

Moore Affidavit, ¶ 20)  Thus, so as not to double-count what had already been paid to Acher for

QA in May 2003 (i.e., $2,590, see Paragraph 16, supra), Acher's QA incentive was $2,510

($5,100-$2,590) for June 2003. (Id.)

21.    Adding this $2,510.00 QA component to the $80.96 MF component above yields

the $2,590.96 represented by the check given to him for June. (See Moore Affidavit, ¶ 21)

### III.    The eSMI Sales Incentive Program And FNC's Payments To Acher Thereunder

22.    Pages 4 and 5 of the Plan reflect how FNC had a third incentive program; i.e., "to reduce slow-moving and obsolete inventory." (See Moore Affidavit, ¶ 22)  Specifically, Acher (and others) could become entitled to a commission on the sale of Eligible Slow Moving Inventory ("eSMI") sales. (Id.)  Pursuant to the Plan, eSMI payouts "are triggered on invoice date in SAP, not the booking date." (Id.)  SAP was FNC's billing system. (Id.)

23.    In his position, Acher received 45% credit for direct sales of eSMI products in New England, but for PICS, he received less credit as that credit was shared throughout the Northeast region. (See Moore Affidavit, ¶ 23)  Acher's allocation of the pool of eSMI monies that were generated through PICS was either approximately 12% or 13%, depending upon the work done and corresponding discretionary allocations applicable. (Id.)

24.    At the end of April 2003, the net value of all eSMI sales invoiced in SAP was $40,001.00. (See Moore Affidavit, ¶ 24)  Based on the Unit Price and Floor value of the eSMI items sold, the total eSMI pool was $3,621.12.[3] (Id.)  Acher was entitled to be paid $425.30 from that pool, a number which was calculated by adding $406.22 (Acher's 12% share of the eSMI PICS pool) and $19.08 (Acher's 45% share of a direct sale worth $47.10). (Id.)

25.    At the end of May 2003, the net value of all eSMI sales invoiced in SAP was $35,982.96, yielding a eSMI sales pool of $2,913.71. (See Moore Affidavit, ¶ 25)  Acher was entitled to be paid $380.24 from that pool, a number which was calculated by adding $376.85 (Acher's 13% share of the eSMI PICS pool) and $3.39 (Acher's 45% share of a direct sale worth $7.54). (Id.)

---

[3]    The formula used to calculate the eSMI Pool, and an example showing the application of that formula is attached at Tab 4.B to the Moore Affidavit.

26.    By June 11, 2003, FNC understood that Acher was entitled to an eSMI payment of $805.54 (i.e., $425.30 + $380.24), and he was paid this amount June 27, 2003, with his May MF and QA payment of $3,095.41. (See Moore Affidavit, ¶ 26)

27.    From June 1-June 11, 2003, the net value of all eSMI sales invoiced in SAP was $7,818.03, yielding an eSMI sales pool of $632.70. (See Moore Affidavit, ¶ 27. Acher should have been paid $82.57, or just over 13% of that pool (13.05% to be exact based on his allocation that month). (Id.) FNC did not pay him this amount, however, due to an error in its system. (Id.) A check for $82.57 will sent by FNC's counsel to Acher's attorney representing payment to him in full under the eSMI program. (Id.)

## IV.    Acher Is Not Entitled To Any Further Incentive Payments For Verizon's Acceptance Of A Proposal Before His Termination Date To Purchase FNC Equipment And, As Set Forth Above, FNC Has Paid Him Those Amounts

28.    Verizon Communications, Inc. ("Verizon") is a regular customer of FNC, and has been for many years. (See Moore Affidavit, ¶ 28) The Tabs attached to the Moore Affidavit, for example, reflect "bookings" from Verizon in April, May and June 2003 under various programs and proposals. (Id.)

29.    On April 30, 2003, Verizon accepted a corporate-wide proposal selecting FNC as one of its three suppliers of certain Next Generation ("NGADM") equipment, including the FW 4100, 4300, 4500 line of products referenced above. (See Moore Affidavit, ¶ 29) Verizon's acceptance of the proposal did not mean that FNC had any volume commitments, nor any guarantee that Verizon would buy its products. (Id.) Instead, Verizon had the discretion to decide which of the three suppliers to buy NGADM products from and no obligation to award a specific dollar amount or percentage of this business to any of the three suppliers. (Id.)

30.    In pertinent part, the Agreement with Verizon provided:

> **3.1    SCOPE OF AGREEMENT** Purchaser and its AFFILIATES agree to purchase on an as-ordered basis and Supplier agrees to sell, PRODUCT(S) and SERVICES and to license LICENSED MATERIALS, when ordered by Purchaser in accordance with the terms and conditions stated in this Agreement at the prices identified in <u>Appendix A</u> hereto, entitled PRICE LIST. **This Agreement is not intended and shall not be construed as a commitment on the part of Purchaser to purchase any PRODUCT(S) and SERVICES, or to purchase a license to any LICENSED MATERIALS from Supplier.** Purchaser, shall on an as-needed basis, assign Supplier as one (1) of a majority award suppliers among three (3) or fewer suppliers to satisfy requirements for PRODUCT, excluding FLM PRODUCT, to be deployed in Purchaser's regulated local exchange network. Purchaser affirms that no supplier will individually be awarded a specific dollar amount or percentage of Purchaser's NGADM business during the term of this Agreement.

(See Moore Affidavit, ¶ 30)

31.    Any "bookings" Acher received under this Agreement (or any of FNC's other Agreements with Verizon) up to his Termination Date – including bookings on FW 4000 series products -- were calculated into the MF and QA incentive payments made to Acher and fully detailed in Part II above. (See Moore Affidavit, ¶ 31)

## ARGUMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c)  As the First Circuit notes, for an issue to be "genuine," "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [] must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Id. (citations omitted)  "[T]he term 'material' means that a fact has the capacity to sway the outcome of the litigation under the applicable law." See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

12

Courts do not adjudicate moot claims. See, e.g., Schock v. United States, 254 F.3d 1, 4 n.3 (1st Cir. 2001); City of Boston v. Boston Edison Co., 260 F.2d 872, 879 (1st Cir. 1958). In particular, where an alleged unpaid amount of money is actually paid, any court claim for the money becomes moot. See Schock, 254 F.3d at 4 (where receiver of defendant paid plaintiff judgment owed, plaintiff's appeal of dismissal of an unsuccessful claim for the same amount of money deemed moot); City of Boston, 260 F.2d at 879 (cross-claim for indemnity deemed moot on appeal since cross-claim defendant paid the amount of money at-issue in the indemnity claim).

The Moore Affidavit filed herewith shows that there is no "genuine" or "material" dispute as to whether Acher has been paid for all commissions due to him under FNC's Incentive Plan as of his termination on June 11, 2003. Indeed, as recognized by the Order and Report, as well as this Court's adopting of the Order and Report upon *de novo* review:

> (i) these are the only damages Acher may seek for alleged breach of the implied covenant of good faith and fair dealing. See McCone v. New England Tel. and Tel. Co., 471 N.E.2d 47, 50 (Mass. 1984) (rejecting plaintiff's claim for income and benefits he could have earned had he remained employed, even if such income and benefits were tied to work he performed before he was terminated); see also Gram v. Liberty Mut. Ins. Co., 461 N.E.2d 796, 797 (Mass. 1984); and
>
> (ii) these are also the only damages Acher could seek in a claim for breach of contract (See Introduction, at 3, supra; see also Statement of Material Facts, ¶ 8, supra)

As set forth above, Acher has been paid in full for all QA, MF or eSMI payments that may have been due to him as of his Termination Date. Because Acher has been paid in full for all such commissions, Acher's claims for breach of contract and breach of the implied covenant of good faith and fair dealing are moot, and the parties should not be litigating moot claims.

For these reasons, summary judgment should be granted dismissing Counts II and III of the Complaint.

## CONCLUSION

For the reasons above, this Motion should be granted and judgment should enter dismissing Acher's Complaint.

<div style="margin-left:50%">

Respectfully submitted,

FUJITSU NETWORK
COMMUNICATIONS, INC.

By its attorneys,

/s/ Jeffrey M. Rosin
Barry A. Guryan, BBO #2 4920
Jeffrey M. Rosin, BBO #6 9216
FOLEY & LARDNER LL
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

</div>

Dated: March 11, 2005

## LOCAL RULE 7.1 CERTIFICATION

I, Jeffrey M. Rosin, hereby certify that I have conferred with counsel for plaintiff, Gary Goldberg, Esq., in a good faith attempt to narrow the matters at-issue herein, but that such conference was unsuccessful.

/s/ Jeffrey M. Rosin
Jeffrey M. Rosin

## CERTIFICATE OF SERVICE

I, Jeffrey M. Rosin, hereby certify that, on this 11th day of March, 2005, I served a copy of this Pleading by Overnight Mail upon counsel for plaintiff:

Gary H. Goldberg, Esq.
Attorney at Law
120 Main Street
Worcester, Massachusetts 01608
(508) 797-1018

/s/ Jeffrey M. Rosin
Jeffrey M. Rosin