UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONALD ACHER, | ) |
| | ) |
| *Plaintiff,* | ) |
| v. | ) CIVIL ACTION NO. 03-12099 (FDS) |
| | ) |
| FUJITSU NETWORK COMMUNICATIONS, | ) |
| INC. | ) |
| | ) |
| *Defendant.* | ) |

## AFFIDAVIT OF DOUGLAS MOORE IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Douglas Moore, Senior Vice President in charge of Sales for Fujitsu Network Communications, Inc. ("FNC"), make the following affidavit based on my personal knowledge unless otherwise stated:

## I.    Background

1.      Acher worked for FNC as a Senior Sales Manager from August 1993 to June 11, 2003. In his position, Acher was in my reporting structure, in my then position as FNC's Vice President of Sales. In his position, Acher was responsible for the New England District. In connection with his employment, Acher received a base salary, and he could be paid monthly incentives under FNC's incentive plan.

2.      FNC's fiscal year ran from April 1st to March 31st. FNC's sales incentive plans were regularly updated and applicable to fiscal half-years. Thus, the sales incentive plan in existence at the time of Acher's termination – i.e. for the first half of 2003 -- extended from April 1, 2003 to September 30, 2003. A true and correct copy of that incentive plan is attached at Tab 1 hereto.

3.      There were two primary types of incentives Acher could earn under the Plan: one based on Quota Attainment ("QA") and one based on Market Focus ("MF"). Both types of incentives were paid based on "bookings," defined as "the net dollar value of all orders received within a given time period." (See Tab 1 at 2)

4.      For the MF component, each fiscal half, FNC aimed to increase the market penetration of certain products and/or services. (See Tab 1, at 3) To incentivize Acher (and others) in this effort, FNC paid a commission of .00478 for each $1 in MF eligible bookings generated. (Id.) Eligible bookings were for the products and/or services that were designated at the start of the fiscal half year as part of the MF program. Those products or services which were part of the MF program in the first half of 2003 are in the Table attached at Tab 2 hereto.

Pertinent to Acher's bookings and MF commissions, detailed below, MF eligible products included the FNC's Flashwave 4100, 4300 and 4500 products and certain so-called "Management Products." (See Tab 2)

5.     For the QA component, FNC gave Acher a "quota" of bookings to achieve for the first half of 2003. Acher's quota for the first half of 2003 was $8 million. Page 3 of the Plan contains a Table which shows how Acher (and others) would be paid depending on his percentage achievement of that quota. (See Tab 1 at 3) For example, if by the end of April 2003, Acher had booked 30% of the $8 million quota (or $2.4 million), he would be paid $70 for every 1 percent achieved, or $2,100. (Id.) If, by the end of May 2003, Acher booked another $2.4 million worth of equipment, he would then have achieved 60% of his quota ($4.8 million/$8 million). (Id.) He would thus be paid $100 for every 1% achieved, less amounts already paid.

6.     All of Acher's bookings, including bookings of MF designated products, would count toward the QA component of the Plan. Acher's bookings were tallied by including:

        (i)     100% of all direct orders originating in New England;

        (ii)    For the first two months of the half year (April/May, 2003), 100% of the Plug-in-Card ("PIC") bookings on Flashwave ("FW") 4000 series and management products (e.g., software to manage the equipment) n the Northeast.

                NOTE:  FW 4000 was new to Verizon in April 2003. Verizon was in a trial period with the products, called a First Office Application ("FOA"). Thus, while the FOA was in progress, Acher got 100% credit for Verizon bookings on any PICS FW 4000 series products in the Northeast territory. When the FOA ended in late May, Acher resumed receiving a 28% allocation of such bookings, see (iii) infra; and

        (iii)   28% of the PICS not already allocated as per (ii) above and booked through the PICS warehouse in Southborough, MA (this 28% was based on an allocation which recognized that the PICS booked through this warehouse were usable through the Northeast and the New England region was deemed to represent 28% of the Northeast).

7.     Under the Plan, Acher could not earn either QA or MF incentives on bookings that occurred after his date of termination. (See Tab 1 at 7)

8.     As the Incentive Plan provided, both QA and MF incentives were to be pro-rated and paid through **"the last day worked."** (See Tab 1 at 7 (emphasis added)) Acher's last day worked was June 11, 2003 ("Termination Date").

## II.    FNC Makes All MF and QA Incentive Payments To Acher

9.     After his Termination Date, FNC made various payments to Acher for: **(a)** his MF incentives on bookings in April 2003 (Acher was not entitled to any QA incentives for April 2003); **(b)** his MF and QA incentives for May 2003; and **(c)** his MF and QA incentives for

2

eligible bookings up to June 11, 2003. A table summarizing all of these payments and the calculations which supported them is attached at Tab 3.A hereto. Evidence of such payments to Acher is attached at Tab 3.B hereto. Below, I explain in detail what is in Tabs 3.A-B.

### (a)   **April 2003**

10.    A $506.20 payment was made by direct deposit to Acher on June 13, 2003. (See Tab 3.B hereto)

11.    This payment was based on MF bookings only. Specifically, there were a total of $105,899.01 in MF qualified bookings in April 2003, for which Acher was given 100% credit (see Paragraph 6(ii), supra):

> FW 4100:  $28,000.01
> FW 4300:  $67,646.00
> FW 4500:  $10,253.00
>
> Total:       $105,899.01

(See Tab 3.A) As set forth on Page 3 of the Plan, this $105,899.01 was multiplied by .00478 to calculate Acher's MF commission for April:  $105,899.01 x .00478 = $506.20. (See Tab 1 at 3)

12.    Acher had bookings in April toward the QA component of the Plan but, as set forth below, his bookings amounted to only 15% of his $8 million quota (or $1,199,422.90). (See Tab 3.A) The $1,199,422.90 was calculated pursuant to the allocations set forth in Paragraph 6 above as follows:

| | |
|---|---:|
| 100% of bookings in New England: | $9,279.61 |
| 100% of PICS bookings on FW 4100, 4300 and 4500 in the Northeast (see Paragraph 6(ii), supra): | $105,899.01 |
| 28% of the remaining PICS bookings in the Northeast: | $1,084,244.28 |
| Total: | $1,199,942.90 |

(See Tab 3.A) Under the Plan, Acher could not begin receiving a QA incentive until he achieved 25% or greater of his $8 million quota. (See Tab 1 at 3) As such, there was no QA commission due to Acher for April 2003.

### (b)   **May 2003**

13.    A $3,095.41 payment was made by direct deposit to Acher on June 27, 2003. (See Tab 3.B)[1]

---

[1]    This $3,095.41 payment, together with a separate $805.54 payment described in Paragraph 26, infra), was part of one check, totaling $3,900.95. (See Tab 3.B)

14. As set forth Tab 3.A , this payment had a $505.41 MF compone it and a $2,590.00 QA component. (See also Note 1, supra)

15. For the MF component, there were a total of $105,735.01 in MF qualified bookings in May 2003 for which Acher received 100% credit (see Paragraph 6(ii), supra):

| | |
|---|---|
| FW 4100: | $3,126 |
| FW 4300: | $28,552 |
| FW 4500: | $74,057.01 |
| Mgmt Products: | $.01 |

Total:          $105,735.02

(See Tab 3.A) As set forth on Page 3 of the Plan, this $105,735.02 was multiplied by .00478 to calculate Acher's MF commission for May: $105,735.02 x .00478 = $504.41. (See Tab 1 at 3)

16. For the QA component, in May 2003, Acher achieved an additional 22% of his $8 million quota as follows:

| | |
|---|---|
| 100% of bookings in New England: | $8,341.46 |
| 100% of PICS bookings on FW 4100, 4300 and 4500 in the Northeast (see Paragraph 6(ii), supra): | $105,735.02 |
| 28% of the remaining PICS bookings in the Northeast: | $1,668,792.12 |
| Total: | $1,782,868.60 |

(See Tab 3.A) Adding that $1,782,868.60 total to the 15% (or $1,199,422.61) Acher booked in April 2003, Acher's total percentage QA achievement by the end of May 2003 was 37%. (Id.) As such, pursuant to the Table on Page 3 of the Plan, Acher's QA incentive component was 37 x $70, or $2,590. (See Tab 1 at 3)

### (c)    June 1, 2003 – June 11, 2003

17. A $2,590.96 payment was made by direct deposit to Acher on July 25, 2003. (See Tab 3.B) This payment had an MF component of $80.96 and a QA component of $2,510.00. (See Tab 3.A).

18. For the MF component, there were a total of $60,487.08 in MF qualified bookings from June 1-June 11, 2003:

| | |
|---|---|
| FW 4100: | N/A |
| FW 4300: | $9,250 |
| FW 4500: | $43,237.08 |
| Mgmt Products: | $8,000 |
| Total: | $60,487.08 |

(See Tab 3.A) However, as set forth in Paragraph 6(ii) above, Acher was not entitled to 100% credit for these bookings (as he was in April and May), but rather the standard 28% allocation to New England. Multiplying 28% by $60,487.08, Acher's total MF bookings from June 1-June 11, 2003 was $16,936.38. (See Tab 3.A) Pursuant to the Plan, this $16,936.38 figure was multiplied by .00478, which equaled $80.96. (Id.)

19.     For the QA component, from June 1-June 11, 2003, Acher achieved an additional 14% of his $8 million quota as follows:

| 100% of bookings in New England: | | $142,851.84 |
|---|---|---|
| 28% of the PICS bookings | | |
| in the Northeast: | | $933,565.74 |
| | Total: | $1,076,417.58 |

(See Tab 3.A) Adding Acher's QA totals from April, $1,199,422.61, and May, $1,782,868.59, to the June total above, he now had a QA total of $4,058,708.78. (Id.) This represented 51% of his $8 million quota. (Id.) Pursuant to the Table on Page 3 of the Plan, Acher now could be paid a QA incentive of $100 for every percentage achieved, or $5,100. (See Tab 1 at 3)

20.     As the Plan provided, "Each month, [participants'] quota attainment will be re-calculated, less any amount [the participant has] already been paid for that component." (See Tab 1 at 6) Thus, so as not to double-count what had already been paid to Acher for QA in May 2003 (i.e., $2,590, see Paragraph 16, supra), Acher's QA incentive was $2,510 ($5,100-$2,590) for June 2003. (See Tab 3.A)

21.     Adding this $2,510.00 QA component to the $80.96 MF component above yields the $2,590.96 represented by the check given to him for June. (See Tab 3.B)

## III.   The eSMI Sales Incentive Program And FNC's Payments To Acher Thereunder

22.     Pages 4 and 5 of the Plan reflect how FNC had a third incentive program; i.e., "to reduce slow-moving and obsolete inventory." (See Tab 1 at 4-5) Specifically, Acher (and others) could become entitled to a commission on the sale of Eligible Slow Moving Inventory ("eSMI") sales. (Id.) Pursuant to the Plan, eSMI payouts "are triggered on invoice date in SAP, not the booking date." (Id. at 5) SAP was FNC's billing system.

23.     In his position, Acher received 45% credit for direct sales of eSMI products in New England, but for PICS, he received less credit as that credit was shared throughout the Northeast region. Acher's allocation of the pool of eSMI monies that were generated through PICS was either approximately 12% or 13%, depending upon the work done and corresponding discretionary allocations applicable.

24.     At the end of April 2003, the net value of all eSMI sales invoiced in SAP was $40,001.00. (See Tab 4.A) As Tab 4.A shows, based on the Unit Price and Floor value of the

eSMI items sold, the total eSMI pool was $3,621.12.[2] (See Tab 4.A at 1) Acher was entitled to be paid $425.30 from that pool, a number which was calculated by adding $406.22 (Acher's 12% share of the eSMI PICS pool) and $19.08 (Acher's 45% share of a direct sale worth $47.10). (See Tab 4.A at 2)

25.    At the end of May 2003, the net value of all eSMI sales invoiced in SAP was $35,982.96, yielding a eSMI sales pool of $2,913.71. (See Tab 4.A at 1) Acher was entitled to be paid $380.24 from that pool, a number which was calculated by adding $376.85 (Acher's 13% share of the eSMI PICS pool) and $3.39 (Acher's 45% share of a direct sale worth $7.54). (See Tab 4.A at 2)

26.    By June 11, 2003, FNC understood that Acher was entitled to an eSMI payment of $805.54 (i.e., $425.30 + $380.24), and he was paid this amount June 27, 2003, with his May MF and QA payment of $3,095.41. (See Moore Affidavit, Tab 3.B; see also Note 1 supra)

27.    From June 1-June 11, 2003, the net value of all eSMI sales invoiced in SAP was $7,818.03, yielding an eSMI sales pool of $632.70. (See Tab 4.A at 1) Acher should have been paid $82.57, or just over 13% of that pool (13.05% to be exact based on his allocation that month). (See Tab 4.A at 2) FNC did not pay him this amount, however, due to an error in its system. A check for $82.57 will sent by FNC's counsel to Acher's attorney representing payment to him in full under the eSMI program. (See Tab 5 hereto)

## IV.    Acher Is Not Entitled To Any Further Incentive Payments For Verizon's Acceptance Of A Proposal Before His Termination Date To Purchase FNC Equipment And, As Set Forth Above, FNC Has Paid Him Those Amounts

28.    Verizon Communications, Inc. ("Verizon") is a regular customer of FNC, and has been for many years. The Tabs attached hereto, for example, reflect "bookings" from Verizon in April, May and June 2003 under various programs and proposals.

29.    On April 30, 2003, Verizon accepted a corporate-wide proposal selecting FNC as one of its three suppliers of certain Next Generation ("NGADM") equipment, including the FW 4100, 4300, 4500 line of products referenced above. Verizon's acceptance of the proposal did not mean that FNC had any volume commitments, nor any guarantee that Verizon would buy its products. Instead, Verizon had the discretion to decide which of the three suppliers to buy NGADM products from and no obligation to award a specific dollar amount or percentage of this business to any of the three suppliers. (See generally, Tab 6.A hereto (excerpts of Agreement between FNC and Verizon))

30.    In pertinent part, the Agreement with Verizon provided:

> **3.1    SCOPE OF AGREEMENT** Purchaser and its AFFILIATES agree to purchase on an as-ordered basis and Supplier agrees to sell, PRODUCT(S) and

---

[2]    The formula used to calculate the eSMI Pool, and an example showing the application of that formula is attached at Tab 4.B hereto.

SERVICES and to license LICENSED MATERIALS, when ordered by Purchaser in accordance with the terms and conditions stated in this Agreement at the prices identified in <u>Appendix A</u> hereto, entitled PRICE LIST. **This Agreement is not intended and shall not be construed as a commitment on the part of Purchaser to purchase any PRODUCT(S) and SERVICES, or to purchase a license to any LICENSED MATERIALS from Supplier**, Purchaser, shall on an as-needed basis, assign Supplier as one (1) of a majority award suppliers among three (3) or fewer suppliers to satisfy requirements for PRODUCT, excluding FLM PRODUCT, to be deployed in Purchaser's regulated local exchange network. Purchaser affirms that no supplier will individually be awarded a specific dollar amount or percentage of Purchaser's NGADM business during the term of this Agreement.

(<u>See</u> Tab 6.A (bold, underlined emphasis added)).

31.    Any "bookings" Acher received under this Agreement (or any of FNC's other Agreements with Verizon) up to his Termination Date – including bookings on FW 4000 series products -- were calculated into the MF and QA incentive payments made to Acher and fully detailed in Part II above.

Signed under the penalties of perjury this **10**<sup>th</sup> day of March, 2005.

Douglas Moore, Senior Vice President of Sales

7

**TAB 1**

# Fujitsu Network Communications, Inc.



# Sales Incentive Plan
# Field Sales Managers
## 1H2003

## What's New for 1H2003

- ✓ A commission-based component, in addition to a quota-based component; commission rates vary by job; payouts are earned separately under each component and are not dependent upon each other;

- ✓ Quota assigned based on *individual* bookings only;

- ✓ Higher accelerators for above-quota performance and 25% threshold on quota-based component;

- ✓ Rate-based payout (instead of a percentage of base salary) for quota performance;

- ✓ No SPIF plan (except eSMI); and

- ✓ eSMI plan has been modified to add a cap on incentive generated from a single unit.

## Understanding the Plan

As a member of the FNC sales team, you are eligible for the Sales Incentive Plan (SIP). Participants in the SIP include employees in the following positions:

- Sales Engineer (both Headquarters and Field positions)
- Sales Manager (both Headquarters and Field positions)
- Director - Sales (both Headquarters and Field positions)
- Senior Director – Sales Operations
- Vice President – Sales
- Senior Vice President - Sales

## Understanding the Performance Measures

### Bookings

Bookings are the net dollar value of all orders received within a given time period. This includes new orders, changes, cancellations, product returns and credit memos. Product returns are the net dollar value of all equipment physically returned to the Company. Product returns are considered negative bookings at the time they are physically returned to the Company and transacted back into inventory.

At the beginning of each half, bookings *quotas* are established for each plan participant. Quotas are established by management using criteria such as account plans, most recent forecasts, budget review plans, and past achievement records. Approval of quotas requires at least two levels of management approval (including a manager at the VP level or above).

Quotas established for individual sales team members should roll up to the VP level. For example, quotas for VPs are the sum of the quotas of their direct reports. Field Sales Engineers' quotas should add up to their Sales Manager's quota.

Quotas will not be adjusted due to price reductions. Completed or expected price reductions are considered in the budget/quota setting process.

## Understanding Your Bookings Earnings Potential

There are two components to incentive compensation:

1. Quota Attainment (QA)
2. Market Focus (MF) Commission

### Component #1 - Quota Attainment (QA)

At the beginning of the fiscal half, an individual bookings quota is assigned; credit towards quota Is given for all products and services (including eSMI) bookings generated during the half. Based on the chart below, a dollar value is assigned to each performance level as indicated. Payout is determined by multiplying the quota attainment by the assigned rate for that performance level.

| % of Quota Attained | 0-24 | 25-49 | 50-74 | 75-99 | 100-109 | 110-119 | 120-129 | 130+ |
|---|---|---|---|---|---|---|---|---|
| Rate per Point of Quota Attainment | $0 | $70 | $100 | $120 | $140 | $200 | $300 | $450 |

Example:

| % of Quota Attained | 0 | 40 | 60 | 85 | 100 | 115 | 125 | 135 |
|---|---|---|---|---|---|---|---|---|
| Payout | $0 | $2,800 | $6,000 | $10,200 | $14,000 | $23,000 | $37,500 | $60,750 |

### Component #2 - Market Focus (MF) Commission

Each fiscal half, senior management will determine which products and/or services will be designated in order to drive increased market penetration efforts – these may vary by account. All products and/or services included in this component will be rewarded on a commission basis, and commission rates vary by job and territory. The commission rate for Field Sales Managers is:

.478% for each $1 in commission-eligible bookings generated

Example:

$3,000,000 products/services sold x .00478 = $14,340

At the beginning of the fiscal half, you will be provided with a listing of products/services - specific to your account – that are eligible for the Market Focus category.

Provided below is an example of a payout matrix at different bookings achievement levels.

## QUOTA: $6.2 million

| % OF BOOKINGS AS ^KT FOCUS PRODS/SVCS | | 25% | 50% | 75% | 100% | 110% | 120% | 130% |
|---|---|---|---|---|---|---|---|---|
| | | | | | % OF QUOTA ACHIEVED | | | |
| | 10% | 2,491 | 6,482 | 11,223 | 16,964 | 25,260 | 39,556 | 62,353 |
| | 20% | 3,232 | 7,964 | 13,445 | 19,927 | 28,520 | 43,115 | 66,205 |
| | 30% | 3,973 | 9,445 | 15,668 | 22,891 | 31,780 | 46,669 | 70,058 |
| | 40% | 4,714 | 10,927 | 17,891 | 25,854 | 35,040 | 50,228 | 73,911 |
| | 50% | 5,455 | 12,409 | 20,114 | 28,818 | 38,300 | 53,782 | 77,763 |
| | 60% | 6,195 | 13,891 | 22,336 | 31,782 | 41,560 | 57,336 | 81,616 |
| | 70% | 6,936 | 15,373 | 24,559 | 34,745 | 44,820 | 60,894 | 85,469 |
| | 80% | 7,677 | 16,854 | 26,782 | 37,709 | 48,080 | 64,451 | 89,321 |
| | 90% | 8,418 | 18,336 | 29,004 | 40,672 | 51,340 | 68,007 | 93,174 |
| | 100% | 9,159 | 19,818 | 31,227 | 43,636 | 54,600 | 71,563 | 97,027 |

## Other Sales Incentives

### eSMI Incentive

The objective of this SPIF is to continue to reduce slow-moving and obsolete inventory.

At the end of each month, the incentive pool is calculated and determined based on two factors, (a) the floor price and (b) the premium above the floor price:

a. For all SMI sales (equal to or greater than the floor price), the incentive pool is 3% of the floor price.
b. For sales above the floor price, the incentive pool includes an escalating factor that is applied only to the premium (the difference between selling price and floor price); the escalating factor is defined below:

| For Sales Above the Floor Price<br>(the floor is equal to 100%) | Incentive Factor<br>(applied to premium only) |
|---|---|
| Equal to or greater than 110% but less than 120% | 5.0% |
| Equal to or greater than 120% but less than 130% | 6.5% |
| Equal to or greater than 130% but less than 140% | 7.5% |
| Equal to or greater than 140% but less than 150% | 10.0% |
| Equal to or greater than 150% but less than 160% | 12.5% |
| Equal to or greater than 160% but less than 170% | 15.0% |
| Equal to or greater than 170% but less than 180% | 17.5% |
| Equal to or greater than 180% but less than 190% | 20.0% |
| Equal to or greater than 190% but less than 200% | 22.5% |
| Equal to or greater than 200% | 25.0% |

The total incentive generated **from a single unit** will be capped at $1,250 per unit.

Sales below the floor price require prior documented approval from Business Management and would likely require incremental sales of non-SMI equipment other business justification to justify/offset the lower price or. In this case, the incentive is 3% of the selling price for the qualified SMI parts. (Consider this case as a one-time reduction of the floor and thus the incentive is a straight 3% of the "floor.")

Sales incentives are calculated on qualified parts as a function of final selling price with respect to the floor price established for that part at the time of order acceptance. The floor prices are published as part of the qualified SMI listing. Not all "FNC SMI" parts are eligible for the incentive program; the parts eligible for this program are a sub-set of traditionally reported FNC SMI. Other sources of FNC SMI (the web, Operations, Order Administration, etc.) may not constitute an eligible SMI part.

Eligible SMI parts are updated the middle of each month after completion of the FNC manufacturing planning cycle. These parts are eligible SMI until the next update subject to quantity on hand (QOH) at time of order acceptance by FNC Order Administration. Should a parts' availability be depleted during the month QOH=0, it is no longer eligible for the SMI incentive program during that month. (Any additional incoming inventory that period would be based on planned needs and therefore not eligible.)

Incentive payouts are triggered on invoice date in SAP, not the booking date. The booking date is used to establish the validity of the qualified unit and the floor price. The payout is calculated and processed following the end of the monthly cycle in which the invoice was created.

Returns policy: Each salesperson is responsible for the incentives paid to him relating to subsequent customer returns for a period of 120 days from date of invoice.

eSMI earnings are capped at the amount equivalent to 100% quota attainment under the Quota Attainment component until at least 75% of quota is achieved. For example, Field Sales Managers can earn up to $14,000 in eSMI incentive during 1H03 until they achieve 75% of their quota. Once 75% of quota is achieved, they can earn the remainder of the eSMI incentive.

**Special Bookings Incentives**

These incentives allow for multiple sales team members to get full or partial credit for an order or group of orders, or for a customer or group of customers. Provided below is a description of the special bookings incentives offered for 1H03:

♦ 4010 product bookings will be given double bookings credit on the MF commission component. For example: for every $1 in 4010 bookings generated, you will receive $2 credit on the commission component.

**Account Transfers**

In the event an account is transferred from one Field Sales Manager to another, the following rules will apply:

♦ If an account is transferred from one Field Sales Manager to another, then both would receive full commission on post-transfer sales – **only for the remainder of the fiscal half.** For example, Sales Manager A calls on an account and receives an order of $100,000 (for purposes of illustration, assume that this order is all MF-eligible products). Then, the account is transferred to Sales Manager B, who then generates from that account an additional $200,000 in bookings (again, assuming all are MF-eligible bookings) for the remainder of the fiscal half. Provided below is an illustration of how the incentive would be paid to each Sales Manager:

| | |
|---|---|
| Sales Manager A | Receives .00478 commission on $100,000, *plus* |
| | Receives $100,000 credit against Quota Attainment, *plus* |
| | Receives .00478 commission on $200,000 |
| Sales Manager B | Receives .00478 commission on $200,000, *plus* |
| | Receives $200,000 credit against Quota Attainment |

♦ If a new customer lead is generated and passed from Field Sales Manager A to Field Sales Manager B (with no orders generated by Sales Manager A), then Sales Manager A would receive a lead generation bonus in the amount of $750 gross, upon $100,000 in bookings generated from the account during the first 6-month period after the lead is passed to Sales Manager B. At the discretion of Sales Manager B, Sales Manager A must set up an initial meeting with the customer.

## *Understanding the Procedures*

At the end of each month, your actual performance against quota will be calculated. In addition, your commission will be calculated based on the amount of eligible products/services booked during the month. Based on these calculations, you may be eligible to receive a SIP payout. For the Quota Attainment component, your performance to date will be calculated against your fiscal half quota. Each month, your quota attainment payout will be re-calculated, less any amount you have already been paid for that component.

## *General Rules Regarding Eligibility*

| | |
|---|---|
| **NEW HIRES** | QA component pro-rated based on date of hire; quota will be established within 30 days of hire. MF component paid based on MF-eligible bookings generated from date of hire to end of fiscal half. |
| **TRANSFER/ PROMOTION INTO ELIGIBLE POSITION** | QA component pro-rated based on date of transfer/promotion; quota will be established within 30 days of effective date. MF component paid based on MF-eligible bookings generated from date of transfer to end of fiscal half. |
| **PROMOTIONS OR TRANSFERS FROM SALES TO ANOTHER SALES JOB** | If you change positions during the fiscal half, your Director or VP will need to establish new SIP quota(s) for your new position. At the end of the half, your achievement of quota(s) will be calculated. The results will be prorated based on your length of time during the half in each position. |
| **TRANSFER/ PROMOTION OUT OF ELIGIBLE POSITION** | QA component pro-rated based on time in position and based on performance as of last day of eligibility. MF component paid based on MF-eligible bookings generated from beginning of fiscal half to transfer date. |
| **LEAVES OF ABSENCE** | If LOA is 30 days or less, then pro-rating rules do not apply; if LOA is more than 30 days, then the VP must review and determine whether or not to adjust the quota or to allow credit for MF-eligible bookings. |
| **TERMINATION- VOLUNTARY, INVOLUNTARY, RIF** | QA component pro-rated based on time with the company and based on performance as of last day worked. MF component paid based on MF-eligible bookings generated from beginning of fiscal half to last day worked. |

## *Plan Evaluation and Revisions*

Sales Management, in conjunction with the Human Resources department, will review plan performance regularly.

These guidelines do not constitute a contract for employment or a guarantee of current or future employment with Fujitsu either expressed or implied. If there are any inconsistencies between these policies and state, local, or federal laws, the applicable law will prevail. The Company reserves the right to amend, clarify, change, or terminate these sales plans and policies at any time. If changes are made, the Company will endeavor to notify those who are affected by the change.

**TAB 2**

Confidential

## 2H04 Product Hierarchy Assignments - Eastern Region Sales

| Market Focus (Commission) | |
|---|---|
| FASST - Africa, Hammerhead | |
| Multiple Commission | |
| **Product Hierarchy** | **Description** |
| 001000550061100000 | Africa A100 |
| 001000550061110000 | Africa A2000 |
| 001000550061120000 | Africa A4000 / A8000 |
| 001000550061130000 | Aspen |
| 0010005500* | DATA PRODUCTS |

| Market Focus (Commission) | |
|---|---|
| NETSMART | |
| Multiple Commission | |
| **Product Hierarchy** | **Description** |
| 1000100015600000 | NETSMART 1500 |



| Market Focus (Commission) | |
|---|---|
| Technical Services | |
| Multiple Commission | |
| **Product Hierarchy** | **Description** |
| 0010000100 | FNC Technical Services |
| 001000010001000000 | FNC Educational Svcs |
| 001000010002000000 | FNC Field Services |
| 001000010003000000 | FNC TAC Services |
| 001000010004000000 | FNC LAB Access (CRG) |
| 001000010005000000 | FNC PCN Upgrade Services |
| 003000920004000000 | Test and Turn Up |
| 003000920005000000 | Other EF&I |
| 0030009300 | Technical Operations |
| 003000930001000000 | Educational Services |
| 003000930002000000 | Fields Services |
| 003000930003000000 | TAC Services |
| 003000930004000000 | Lab Services |
| 003000930005000000 | FNC PCN Upgrade Services |
| 003000930082100000 | Test & Turn-Up |
| 003000930082110000 | Fiber Pre-Qualification |
| 003000930083010000 | Transmission Repairs |
| 003000930083020000 | Switching Repairs |
| 003000930083060000 | SDH Repairs |
| 003000930084000000 | Training |
| 003000930085010000 | TAC (NMS) |
| 003000930085020000 | TAC (Transport) |
| 003000930085030000 | NOC Services |
| 003000930085040000 | netSpares |
| 003000930085050000 | netResponse |
| 003000930086510000 | netMigration |
| 003000930086520000 | netRestore |
| 003000930086530000 | Network Design |
| 003000930086540000 | Program Management |
| 003000930086550000 | Interoperability Testing |
| 003000930086560000 | netDiscover |
| 003000930086570000 | TAC (Transport) |
| 0030009500 | Professional Services |
| 003000950001000000 | Professional Services |
| 003000950083000000 | PCN's |
| 003000950093020000 | Repair Services |
| 0030009600* | NOC Services |

| Market Focus (Commission) | |
|---|---|
| FW 4800, FW 7500, FW 7410, FW 7420, BTI | |
| Multiple Commission | |
| **Product Hierarchy** | **Description** |
| 1000140017100000 | FLASHWAVE 7500 |
| 001000140017500000 | BTI |
| 1000140017300000 | FLASHWAVE 7410 |
| 1000140017350000 | FLASHWAVE 7420 |
| 001000940015330000 | PCD - FW 4500 |
| 001000080015330000 | FLASHWAVE 4500 |
| 001000080015351533 | NBO - FLASHWAVE 4500 |

| Market Focus (Commission) | |
|---|---|
| FW 4100, FW 4010, FW 4020, FW 4300, | |
| FW 4xxx H/W, PCD 4xxx | |
| Multiple Commission | |
| **Product Hierarchy** | **Description** |
| 001000080015130000 | FLASHWAVE 4100 |
| 001000080015140000 | FLASHWAVE 4010 |
| 001000080015150000 | FLASHWAVE 4020 |
| 001000080015230000 | FLASHWAVE 4300 |
| 001000080015310000 | FLASHWAVE 4000 H/W |
| 001000080015351523 | NBO - FLASHWAVE 4300 |
| 001000940015130000 | PCD - FW 4100 |
| 001000940015140000 | PCD - FW 4010 |
| 001000940015150000 | PCD - FW 4020 |
| 001000940015230000 | PCD - FW 4300 |
| 001000940015310000 | PCD FW 4xxx |

# TAB 3.A

Fujitsu Network Communications, Inc.

Confidential

## Monthly Bookings - APRIL

| Area / Product | Quota Bookings | Portion of Quota Bookings for MPF Component (100%) | PICS (28%) |
|---|---|---|---|
| New England (Direct Orders) | 9,279.61 | 0.04 | |
| Manuals | 1,618.60 | | |
| FLM 150 ADM | 4,671.60 | | |
| FLM 600 ADM | 2,990.57 | | |
| FLM 2400 ADM | | | |
| | | | |
| Northeast Hdqtrs (PICS) | 3,976,200.00 | 105,899.61 | 1,094,244.29 |
| Manuals | 0.01 | | 0.00 |
| FLM 150 ADM | 1,427,317.04 | | 390,648.77 |
| FW 4100 | 28,000.01 | 28,000.01 | |
| FLM 600 ADM | 1,268,902.51 | | 355,231.10 |
| FW 4390 | 67,646.00 | 67,646.00 | |
| FLM 2400 ADM | 1,166,931.43 | | 326,740.60 |
| FLASH 1192 | 9,370.00 | | 2,623.60 |
| FW 4500 | | | |
| FLASH 1192 H/W | 10,253.00 | 10,253.00 | |
| Mgmt Products | | | |

Products eligible for MF Commissions

## Monthly Bookings - MAY

| Area / Product | Quota Bookings | Portion of Quota Bookings for MPF Component (100%) | PICS (28%) |
|---|---|---|---|
| New England (Direct Orders) | 8,341.45 | | 8,341.45 |
| Manuals | 511.92 | | 0.00 |
| FLM 150 ADM | | | |
| FLM 600 ADM | 7,829.49 | | |
| FLM 2400 ADM | | | |
| | | | |
| Northeast Hdqtrs (PICS) | 6,085,706.85 | 165,735.92 | 1,652,793.12 |
| Manuals | 0.01 | | 0.00 |
| FLM 150 ADM | 3,612,411.77 | | 1,011,475.30 |
| FW 4100 | 3,126.00 | 3,126.00 | |
| FLM 600 ADM | 1,313,085.84 | | 367,832.04 |
| FW 4390 | 28,552.00 | 28,552.00 | |
| FLM 2400 ADM | 1,033,874.25 | | 289,484.79 |
| FLASH 1192 | 74,057.00 | 74,057.00 | |
| FW 4500 | | | |
| FLASH 1192 H/W | 0.01 | 0.02 | |
| Mgmt Products | | | |

Products eligible for MF Commissions

## Monthly Bookings - June 1 thru June 11

| Area / Product | Quota Bookings | Portion of Quota Bookings for MPF Component (100%) | PICS (28%) |
|---|---|---|---|
| New England (Direct Orders) | 142,851.84 | | 933,565.74 |
| Manuals | | | 0.02 |
| FLM 150 ADM | 23,590.92 | | 266,194.48 |
| FLM 600 ADM | 48,810.75 | | |
| FLM 2400 ADM | 70,450.17 | | |
| | | | |
| Northeast Hdqtrs (PICS) | 3,334,143.36 | | |
| Manuals | 0.08 | | |
| FLM 150 ADM | 1,022,123.16 | | |
| FW 4100 | 1,421,226.68 | | 367,943.33 |
| FW 4390 | 9,250.00 | n/a | 2,580.00 |
| FLM 2400 ADM | 830,326.86 | | 232,491.52 |
| FLASH 1192 | | | |
| FW 4500 | 43,237.68 | n/a | 12,106.38 |
| FLASH 1192 H/W | | | |
| Mgmt Products | 8,000.00 | | 2,240.00 |

Products eligible for MF Commissions

## Monthly Payouts

MPF Rate: 0.04780

| Month | Direct Orders | PICS Allocation (28%) | FLASHWAVE PICS Allocation (100%) |
|---|---|---|---|
| April | 9,279.61 | 1,094,244.29 | 105,899.01 |
| May | 8,341.45 | 1,658,792.12 | 105,735.02 |
| June | 142,851.84 | 933,565.74 | |

| Month | Total Bookings Towards Quota | Quota Achieve % | MPF Direct Orders | MPF PICS Allocation (28%) | MPF FLASHWAVE PICS Allocation (100%) | Total MPF Bookings |
|---|---|---|---|---|---|---|
| April | 1,199,422.90 | 15% | | | 165,899.01 | 105,899.01 |
| May | 1,782,869.60 | 22% | | | 105,735.02 | 105,735.02 |
| June | 1,076,417.58 | 14% | | 16,936.38 | | 16,936.38 |

| Month | Quota Payout | MPF Payout | Total Payout Earned |
|---|---|---|---|
| April | $    - | $    506.20 | $    506.20 |
| May | $ 2,590.00 | $ 505.41 | $ 3,095.41 |
| June | $ 2,510.00 | $ 80.96 | $ 2,590.96 |

# TAB 3.B

XXX.XXXXXX.XA







ProBusiness Payroll Company Menu

View Check

Check # D423098    Date 05/27/2003    Emp ID 002503    SS # 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    Div/Sub MA/MA

Pay To  ACHER, DONALD  M.    Home Div 00    Home Dpt 3920    Run 705

Gross 3900.96    Deductions 0.00    Taxes 1238.55    Net 2662.41

### Earnings

| Code | Descrip | Rate | Hours | Amt | Yld |
|------|---------|------|-------|-----|-----|
| C | COMMISSN | 0.0000 | 0.00 | 3095.41 | 22240.28 |
| SPI | SPIF PAY | 0.0000 | 0.00 | 805.55 | 1849.62 |

### Deductions

| Code | Descrip | Amt | Yld |
|------|---------|-----|-----|

### Employee Taxes

| Code | Amt | Yld | Taxable Wages | Eligible Wages |
|------|-----|-----|---------------|----------------|
| USFIT | 975.24 | 24354.79 | 3900.96 | 3900.96 |
| USFICA | 0.00 | 5394.00 | 0.00 | 3900.96 |
| USFMED | 56.58 | 1638.11 | 3900.96 | 3900.96 |
| MASIT | 206.75 | 5160.88 | 3900.96 | 3900.96 |
| MAVDI | 0.00 | 512.24 | 0.00 | 3900.96 |

### Direct Deposit

| Type | Amt | Transit | Acct |
|------|-----|---------|------|
| Checking | 2662.41 | 011302357 | 7942080 |

Help    ER Taxes    OK



Company Menu    FNC-INC - Fujitsu Network Communications, Inc —    Printer - \\RCHPRT01\PAYHP8000    OVR

Start    1:49 PM

Case 1:03-cv-12090-FDS    Document 34    Filed 03/11/2008    Page 24 of 37





**TAB 4.A**

Eligible SMI Activity Report - April 2003
Create date:    04/01/2003 to 04/30/2003

| Sales Office | Product Hierarchy | Product Hierarchy Description | Sold-to | Sold-to Name | Sales Manager | Sales Mgr | Material | Sales Order | Invoice Qty | Purchased eSMI Qty | Net Value | Unit Price | Unit Floor | Incentive Factor | Sales Pool | Incremental Price | Escalating Factor | Total Comp Pool | Sales Pool | Diff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2104 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | Asher | PICS | FCM0740HSN1-X05 | 314698 | 3 | | 526.00 | 526.00 | 265.00 | 20 | 47.10 | 241.00 | 184.5616823 | $  58.75 | $  47.10 | $  (0.00) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740WA1-X02 | 310828 | 3 | | 915.00 | 305.00 | 165.00 | 20 | 82.95 | 140.00 | 184.8488848 | $  98.65 | $  82.95 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740WA1-X02 | 316828 | 3 | | 915.00 | 305.00 | 165.00 | 20 | 82.95 | 140.00 | 184.8488848 | $  98.65 | $  82.95 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740WA1-X02 | 316829 | 3 | | 975.00 | 325.00 | 165.00 | 20 | 190.59 | 140.00 | 184.9666645 | $  131.80 | $  190.59 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740WA1-X02 | 316960 | 3 | | 1,275.00 | 425.00 | 265.00 | 20 | 96.00 | 350.00 | 184.7266548 | $  199.30 | $  96.00 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V88 | 316251 | 7 | | 5,495.00 | 785.00 | 426.00 | 20 | 491.41 | 350.00 | 184.2722065 | $  592.68 | $  491.41 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V88 | 316252 | 1 | | 785.00 | 785.00 | 426.00 | 20 | 140.63 | 350.00 | 184.2722065 | $  168.06 | $  140.63 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V88 | 316354 | 2 | | 1,570.00 | 785.00 | 426.00 | 20 | 70.26 | 350.00 | 184.2722065 | $  84.58 | $  70.26 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V88 | 314339 | 1 | | 785.00 | 785.00 | 426.00 | 20 | 140.49 | 350.00 | 184.2722065 | $  168.49 | $  140.49 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V88 | 314389 | 2 | | 1,570.00 | 785.00 | 426.00 | 20 | 140.49 | 350.00 | 184.2722065 | $  169.15 | $  140.49 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V89 | 319188 | 11 | | 8,635.00 | 785.00 | 422.00 | 20 | 778.42 | 363.00 | 169.8498573 | $  937.36 | $  778.42 | $  0.00 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V89 | 319168 | 2 | | 1,570.00 | 785.00 | 422.00 | 20 | 140.40 | 363.00 | 184.2722065 | $  169.16 | $  140.40 | $  (0.00) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0710V89 | 314282 | 2 | | 1,570.00 | 785.00 | 426.00 | 20 | 140.40 | 363.00 | 184.2722065 | $  169.16 | $  140.40 | $  (0.00) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740V89 | 320845 | 20 | | 15,700.00 | 785.00 | 720.00 | 20 | 1,415.32 | 353.00 | 185.0189073 | $  1,768.20 | $  1,415.32 | $  (0.00) |
| 2101 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740V89 | 319342 | 5 | | 235.00 | 47.00 | 7.00 | 20 | 42.37 | 40.00 | 671.4296714 | $  51.05 | $  42.37 | $  (0.00) |
| 2101 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | | FCM0740V89 | 319342 | 5 | | 235.00 | 47.00 | 7.00 | 20 | 42.37 | 40.00 | 671.4296714 | $  51.05 | $  42.37 | $  (0.00) |
| 2101 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | Slagiel | PICS | FCM0740V89 | 316556 | 1 | | 47.00 | 47.00 | 7.00 | 20 | 8.47 | 40.00 | 671.4296714 | $  10.21 | $  8.47 | $  0.00 |
| 2101 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | Slagiel | | FCM0740MP79 | 316558 | 2 | | 818.00 | 660.00 | 222.00 | 20 | 73.14 | 187.00 | 184.2242042 | $  89.12 | $  73.14 | $  0.00 |

|  | | Sub-Total: Verizon-Bell Atlantic North | | | | | | | 64 | 0 | 60,601.00 | | | | 4,362.11 | | | | 4,362.11 | (0.00) |
| | | | | | | | | | | | | | | | | Less 19% Held out for Sales Mtg | 20% | $  362.11 | |
| | | | | | | | | | | | | | | | | Amount Paid Out: | $  3,259.02 | |

Eligible SMI Activity Report - May 2003
Create date:    05/01/2003 to 05/31/2003

| Sales Office | Product Hierarchy | Product Hierarchy Description | Sold-to | Sold-to Name | Sales Mgr | Material | Sales Order | eSMI Qty | Purchased eSMI Qty | Net Value | Unit Price | Unit Floor | Incentive Factor | Sales Pool | Incremental Price | Escalating Factor | Total Comp Pool | Sales Pool | Diff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | Asher | FCM0740TQN1 | 320400 | 10 | | 485.51 | 48.53 | 7.00 | 25 | 7.84 | 39.53 | 664.7142857 | $  9.39 | $  7.84 | $  0.84 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0740WA1-X02 | 319737 | 1 | | 47.00 | 47.00 | 7.60 | 25 | 7.62 | 41.00 | 671.4283714 | $  9.55 | $  7.62 | $  (0.55) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0740TQN1 | 319544 | 2 | | 94.00 | 47.00 | 7.60 | 25 | 15.25 | 41.00 | 671.4283714 | $  20.42 | $  15.25 | $  (1.65) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0670V89 | 320905 | 8 | | 4,662.30 | 777.15 | 422.00 | 25 | 329.10 | 355.15 | 184.1585978 | $  398.63 | $  329.10 | $  (69.45) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0670V89 | 322319 | 1 | | 777.15 | 777.15 | 422.00 | 25 | 623.18 | 355.15 | 184.1585978 | $  833.90 | $  623.18 | $  69.45 |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0670V89 | 322310 | 10 | | 25,314.90 | 777.15 | 422.00 | 25 | 1,875.49 | 355.15 | 184.1585978 | $  2,516.10 | $  1,875.49 | $  (208.39) |
| 2102 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | Slagiel | FCM0740TQN1 | 321782 | 1 | | 48.53 | 48.53 | 7.60 | 25 | 7.54 | 39.53 | 664.7142857 | $  10.05 | $  7.54 | $  (3.01) |

|  | | Sub-Total: VZ Bell Atlantic-North | | | | | | 32 | 0 | 36,982.99 | | | | 2,913.71 | | | | 2,913.71 | (323.75) |
| | | | | | | | | | | | | | | | | Less 18% Held out for the Sales Mtg | 20% | $  323.75 | |
| | | | | | | | | | | | | | | | | Amount Paid Out: | $  2,913.71 | |

Eligible SMI Invoice Activity (for Original) ATP
Create date:    06/01/2003 to 06/30/2003

| Sales Office | Product Hierarchy | Product Hierarchy Description | Sold-to | Sold-to Name | Sales Manager | Material | Sales Order | eSMI Qty | Purchased eSMI Qty | Net Value | Unit Price | Unit Floor | Incentive Factor | Sales Pool | Incremental Price | Escalating Factor | Total Comp Pool | Sales Pool | Diff |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0670V89 | 323860 | 10 | | 7,771.50 | 777.15 | 422.00 | 20 | 632.70 | 3425.15 | 184.1685978 | $  846.99 | $  632.70 | $  (0.84) |
| 2100 | 100000601500000 | FLM 2400 ADM | 10015 | VERIZON-BELL ATLANTIC - NORTH | PICS | FCM0670TQN1 | 322429 | 1 | | 48.53 | 48.53 | 7.60 | 20 | 7.54 | 39.53 | 664.7142857 | $  10.08 | $  7.54 | $  (0.55) |

|  | | Sub-Total: | | | | | | 11 | 0 | 7,818.00 | | | | 632.70 | | | | 632.70 | (70.59) |
| | | | | | | | | | | | | | | | | Less 18% Held out for Sales Mtg | 25% | $  700.00 | |
| | | | | | | | | | | | | | | | | Amount Paid Out: | $  632.70 | |

**1H03 eSMI Activity - April 2003 thru June 11, 2003**

Eastern Region - Northeast

| Dept # | Employee | Empl # | Total eSMI Payout Earned | April eSMI Payout | APRIL 10615 - Archer | | APRIL 10615 - PICS | | APRIL 10615 - Stopsky | | May eSMI Payout | MAY 10615 - Archer | | MAY 10615 - PICS | | MAY 10615 - Stopsky | | June eSMI Payout | JUNE 10615 - V2 NE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | % | $ 47.10 | % | $ 3,492.41 | % | $ 81.61 | | % | $ 7.54 | % | $ 2,898.64 | % | $ 7.54 | | % | $ 632.70 |
| 9920 | Archer, Don | 2383 | $ 7,167.53 | $ 3,621.12 | 100% | $ 47.10 | 100% | $ 3,492.41 | 100% | $ 81.61 | $ 2,913.71 | 100% | $ 7.54 | 100% | $ 2,898.64 | 100% | $ 7.54 | $ 632.70 | 100% | $ 632.70 |
| 9920 | Moore, Doug | 2974 | $ 888.11 | $ 426.30 | 45% | $ 19.08 | 12% | $ 406.22 | | $ - | $ 380.24 | 45% | $ 3.39 | 13% | $ 376.85 | | $ - | $ 82.57 | 13% | $ 82.57 |
| 9920 | Letourneau, Al | 3551 | $ 680.54 | $ 325.89 | 10% | $ 4.24 | 10% | $ 314.31 | 10% | $ 7.34 | $ 291.38 | 10% | $ 0.75 | 10% | $ 289.87 | 10% | $ 0.75 | $ 63.27 | 10% | $ 63.27 |
| 9920 | Lewis, Bill | 3998 | $ 493.39 | $ 236.28 | 25% | $ 10.60 | 6% | $ 225.88 | | $ - | $ 211.24 | 25% | $ 1.88 | 7% | $ 209.36 | | $ - | $ 45.87 | 7% | $ 45.87 |
| 9920 | Wang, Chao | 5824 | $ 1,361.08 | $ 651.90 | 20% | $ 8.48 | 20% | $ 628.63 | 20% | $ 14.69 | $ 582.74 | 20% | $ 1.51 | 20% | $ 579.73 | 20% | $ 1.51 | $ 126.54 | 20% | $ 126.54 |
| 9920 | Ryan, Gerard | 6557 | $ 1,095.56 | $ 578.48 | | $ - | 16% | $ 560.12 | 25% | $ 18.36 | $ 517.18 | 18% | $ - | 18% | $ 515.30 | 25% | $ 1.88 | $ - | | $ - |
| 9920 | Foley, Jennifer | 7672 | $ - | $ - | | $ - | | $ - | | $ - | $ - | | $ - | | $ - | | $ - | $ 112.30 | 18% | $ 112.30 |
| 9920 | Stopsky, Rich | 7902 | $ 112.30 | $ 1,041.26 | | $ - | 29% | $ 1,003.21 | 45% | $ 33.05 | $ 930.93 | 32% | $ - | 32% | $ 927.54 | 45% | $ 3.39 | $ 202.15 | 32% | $ 202.15 |
| | | | $ 2,174.34 | $ - | | $ - | | $ - | | $ - | $ - | | $ - | | $ - | | $ - | $ - | | $ - |
| | 10% Transferred to House | | $ 362.11 | $ 362.11 | 10% | $ 4.71 | 10% | $ 349.24 | 10% | $ 8.16 | | | $ - | | $ - | | $ - | | | $ - |
| | | | $ - | | | | | | | | | | | | | | | | | |

# TAB 4.B

eSMI EXAMPLE PAGE

Eligible SMI Activity Report - April 2003
Create date:    04/01/2003 to 04/30/2003

| Product Hierarchy | Product Hierarchy Description | Profit Ctr | Sales Org | Sales Office | Sales Manager | SoldSb | SoldTo Name | Material | Create Date | Invoice | Sales Order | Doc Type | Item Catg | Item | Invoice Qty | Purchased SMI Qty | Net Value | Unit Price | Unit Floor | Incentive Factor | Sales Pool | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19000W0153X0W00 | FLW 2400 ADM | 9921 | 9921 | 2104 | Ashw | L0615 | VERIZON-BELA ATLANTIC - NORTH | FC38000153I-IN% | 4/8/2003 | 9059722 | 3146696 | OR | TAN | 20 | 1 | | 520.00 | 535.00 | 295.00 | 20 | 47.10 | |

**Calculating the Pool:**

1 Incremental Price Difference = Unit Price - Unit Floor
2 Escalating Factor = (Unit Price / Unit Floor) * 100
   Refer to the Escalating Factor chart in the Plan Doc to determine the actual incentive factor
3 If Unit Price < Unit Floor, the the total compensation pool = (unit price * quantity) * 3%
4 If Unit Price > Unit Floor, total compensation pool = (unit Floor * quantity) * 3% + (incremental price * qty) * escalating factor
5 Sales Compensation Pool = Total Compensation Pool x 83%

**Example:**

1 Incremental Price =    = 520.00 - 285.00 = 241.00
2 Escalating Factor =    = (520.00 / 285.00) * 100 = 184.5614 => 20%

3 Total Comp Pool =    =( (285.00 * 1) * 3% ) + ( (241.00 * 1) * 20% )
                        = 8.55 + 48.20 = 56.75
                        56.75 * 83%

4 Sales Pool =          = 47.10

**TAB 5**



FOLEY & LARDNER LLP
ATTORNEYS AT LAW

111 HUNTINGTON AVENUE
BOSTON, MASSACHUSETTS 02199
617.342.4000 TEL
617.342.4001 FAX
www.foley.com

WRITER'S DIRECT LINE
617.342.4076
jros n@foley.com EMAIL

CLIENT/MATTER NUMBER
304147-0139

March 11, 2005

**BY OVERNIGHT MAIL**

Gary H. Goldberg, Esq.
Attorney at Law
120 Main Street
Worcester, Massachusetts 01608

      Re:    Acher v. Fujtisu Network Communications, Inc. ("FNC"):Civil
             Action No. 03-CIV-12099 (FDS)

Dear Attorney Goldberg:

      Pursuant to Paragraph 27 of the Affidavit of Douglas Moore in Support of Defendant's Motion for Summary Judgment, enclosed please find payment to Mr. Acher of $82.57, representing his Eligible Slow Moving Inventory incentive payment for June 1-June 11, 2003.

      Thank you for your attention.

                        Sincerely,

                        Jeffrey M. Rosin

cc:    Barry A. Guryan, Esq.
       Melanie Scofield, Esq.

BOSTON    JACKSONVILLE    NEW YORK    SAN DIEGO/DEL MAR    TAMPA
BRUSSELS    LOS ANGELES    ORLANDO    SAN FRANCISCO    TOKYO
CHICAGO    MADISON    SACRAMENTO    SILICON VALLEY    WASHINGTON, D.C.    027.152612.1
DETROIT    MILWAUKEE    SAN DIEGO    TALLAHASSEE    WEST PALM BEACH

⑈⑈00009574⑈⑈ ⑈⑈11001150⑈: ⑈⑈0880507148 5⑈⑈

| Employee | | | Id | Social Security | Status | | Exemptions/Allowances | | Number |
|---|---|---|---|---|---|---|---|---|---|
| DONALD  M.  ACHER | | | 002383 | 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 | Single | | US-0/0  MA-0/0 | | 00009574 |
| Code | | Paygroup | Division | Department | Hire Date | Period Start | | Period End | Pay Date |
| FNC INC | | 1 | 00 | 9920 | 08/09/93 | 02/14/05 | | 02/27/05 | 03/10/05 |

| Taxable Earnings | Rate | Units | Current | Year To Date | | | Current | Year To Date |
|---|---|---|---|---|---|---|---|---|
| Special Incentive Pay | | | 82.57 | 82.57 | Gross Pay | | | |
| Total | | | 82.57 | 82.57 | W2 Gross | | 82.57 | 82.57 |

| Taxes | | | | | | |
|---|---|---|---|---|---|---|
| Federal Income Tax | | 20.64 | 20.64 | Net Pay | | 51.57 |
| Social Security (FICA) | | 5.12 | 5.12 | | | |
| Federal Medicare | | 1.20 | 1.20 | | | |
| Massachusetts Income Tax | | 4.04 | 4.04 | | | |
| Total | | 31.00 | 31.00 | | | |

Fujitsu Network Communications, Inc  -  2801 Telecom Parkway  Richardson,  TX  75082

ProBusiness

# TAB 6.A

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ a Delaware corporation with offices at 240 E. 38th St. NY, NY 10016 on behalf of itself and on behalf of its AFFILIATES (see Appendix T), and FUJITSU NETWORK COMMUNICATIONS, INC., a California corporation with offices at 2801 Telecom Parkway, Richardson, Texas, 75082 (hereinafter referred to as "Supplier"). Under the Agreement, Purchaser and any AFFILIATES which directly places an Order or for whom Purchaser places an Order agree to purchase and Supplier agrees to sell PRODUCTS, HARDWARE and/or SERVICES and to license SOFTWARE, DOCUMENTATION and RELATED DOCUMENTATION when ordered by Purchaser in accordance with the terms and conditions stated in this Agreement. Hereinafter, the term "Purchaser" will individually or collectively mean Purchaser and/or any AFFILIATE of Purchaser unless the context in which the term is used intends otherwise.

**Whereas,** Purchaser has issued to Supplier a Request For Proposal (RFP), No. 01-0184-DN dated October 2, 2001, and a Request for Revised Proposal (RRP), Nc. 01-0184-DN dated January 18, 2002, setting forth certain requirements and other information incident to the purchase and deployment of Next Generation Add Drop Multiplexers ("NGADM's") and associated SERVICES, and a license of specified associated Software (including Firmware) and DOCUMENTATION and RELATED DOCUMENTATION. The above-referenced documents are attached hereto as Appendix B.

**Whereas,** Supplier has reviewed and analyzed the RFP and has developed and submitted to Purchaser its Proposal dated November 12, 2002, its Response to the RRP dated February 13, 2002 as well as meetings between the parties, written representations and commitments put forward by Supplier in various documents, e-mails and letters exchanged between the parties specifically addressing questions and comments posed by Purchaser relating to Supplier Proposal responses (hereinafter collectively the "Proposal")

**Whereas,** said Proposal sets forth Supplier's offer and representations including, without limitation, the features, functionality, delivery schedules, conclusions, recommendations, and benefits incident to Supplier's PRODUCTS, HARDWARE, SYSTEM, SOFTWARE, and SERVICES, proposed by Supplier to provide Purchaser with the functional and operational performance capabilities and capacities specified in the RFP; and

**Whereas,** based on the representations contained in Supplier's Proposal, and in reliance upon the expertise of Supplier in developing, designing and delivering SYSTEMS, Purchaser desires to buy PRODUCTS and SERVICES from Supplier and Supplier desires to supply PRODUCTS and SERVICES to Purchaser under the terms and conditions set forth herein; and

1

Not for use or disclosure outside the Verizon Companies and its Affiliates except under written agreement between the parties hereto

**2.8.1**   RELATED    DOCUMENTATION    shall    mean    that DOCUMENTATION, specific to the operation and use of SOFTWARE, such as but not limited to, flow charts, logic diagrams, program listing (other than SOURCE CODE), program descriptions and specifications.

**2.8.2**   LICENSED MATERIALS shall mean the DOCUMENTATION, SOFTWARE and RELATED DOCUMENTATION defined in Sections 2.4 and 2.8 and Sub Section 2.8.1 and for which licenses are granted by Supplier under this Agreement.

**2.9**   **SOURCE CODE** shall mean a computer program in the form of high-level language that generally is not directly executable by a processor.

**2.10**   **OPERATIONS SUPPORT SYSTEM** ("OSS") shall mean that software, interface hardware and processor that interfaces with the PRODUCT in the Purchaser's Network and which (OSS) is required for the operation, administration and/or support (including but not limited to testing, surveillance, billing, provisioning and inventory) of the Purchaser's Network.

**2.11**   **SYSTEM** shall mean all components of the Supplier's PRODUCT(S), purchased hereunder, functioning together, performing and interoperating as a fully integrated and efficient whole with itself and all other Supplier-provided switching, transport, transmission elements, other facilities and equipment in the Purchaser's network in accordance with the requirements and specifications incident to this Agreement or any Order(s) issued pursuant to this Agreement, provided such other facilities and equipment: (i) operate together in accordance with standards contained in industry publications by recognized standards bodies; or (ii) operate in accordance with SPECIFICATIONS contained in this Agreement.

**2.12**   **WORK**    shall    mean    the    provision    of    PRODUCT    and DOCUMENTATION and the performance of SERVICES pursuant to this Agreement or any Order(s) issued pursuant to this Agreement.

**2.13**   **SPECIFICATIONS**   shall mean those specific requirements and detailed specifications set forth in the Requirements Documents.

### ARTICLE 3

### AGREEMENT TO PURCHASE

**3.1**   **SCOPE OF AGREEMENT**



5
Not for use or disclosure outside the Verizon Companies and its Affiliates except under written agreement between the parties hereto

Purchaser, shall on an as-needed basis, assign Supplier as one (1) of a majority award suppliers among three (3) or fewer suppliers to satisfy requirements for PRODUCT, excluding FLM PRODUCT, to be deployed in Purchaser's regulated local exchange network.  Purchaser affirms that no supplier will individually be awarded a specific dollar amount or percentage of Purchaser's NGADM business during the term of this Agreement

**3.2     TERM OF AGREEMENT**  This Agreement shall commence on the date first above written and, unless otherwise terminated pursuant to the provisions of this Agreement, shall continue for a three (3) year term.  Thereafter, this Agreement shall be renewable at the option of Purchaser with notice to Supplier sixty (60) days in advance of the expiration date.  This Agreement shall be effective for PRODUCTS and SERVICES ordered by Purchaser during the term and any extensions thereof.

**3.3     INTERRELATIONSHIP WITH ORDERS**  Whenever the provisions of an Order conflict with the provisions of this Agreement, the typewritten provisions of the Order which have been mutually agreed upon by the parties in writing and which are not pre-printed as part of a form shall control and take precedence over the conflicting provisions of this Agreement, but only for purposes of such Order and, except for the conflicting provisions of such Order, the terms and conditions of this Agreement shall not be deemed to be amended, modified, canceled, or waived.  Conflicting pre-printed provisions on the reverse or front of the forms belonging to either party shall be deemed deleted.

**3.4     GOVERNMENT CONTRACT PROVISIONS**  Upon ACCEPTANCE by Supplier which ACCEPTANCE may be withheld by Supplier depending on the government provisions that may be applicable to such Order, Orders placed pursuant to this Agreement containing a notation that the PRODUCT is intended for use under government contracts shall be subject to the then current government provisions referenced thereon or in attachments thereto.  Such notation on the Order shall specify "for Government Use."

**3.5     NON-EXCLUSIVE MARKET RIGHTS**  It is expressly understood and agreed that this Agreement neither grants to Supplier an exclusive privilege to sell or provide to Purchaser any or all PRODUCTS or SERVICES of the type described in this Agreement which Purchaser may require, nor does it require the purchase of any PRODUCTS or SERVICES from Supplier by Purchaser.  Supplier understands and agrees that Purchaser is free to and may contract with other manufacturers and Suppliers for the procurement of comparable PRODUCTS or SERVICES.

Not for use or disclosure outside the Verizon Companies and its Affiliates except under written agreement between the parties hereto

connection with any claims by Supplier that Purchaser has materially breached its obligations hereunder. Such independent obligation shall continue for ninety (90) days from the date upon which Purchaser receives written notice of such alleged breach from Supplier. Supplier undertakes this independent obligation without prejudice to any rights or remedies it may otherwise have in connection with any dispute between Supplier and Purchaser.

## ARTICLE 32

### ENTIRE AGREEMENT

This instrument, the Appendices and Schedules attached and the Order(s) attached hereto, or hereafter issued under this Agreement, constitute and embody the entire Agreement by and between the parties hereto and supersede all prior oral or written agreements or understandings, if any, between them with respect to the subject matter of this Agreement. In the event of a direct conflict between a specific term or condition of this Agreement and a specific term or condition in an Order, issued and accepted by the parties, the specific term or condition in the Order shall take precedence and control, but only for purposes of that individual Order. All Orders placed by Purchaser shall be deemed to incorporate the terms and conditions of this Agreement as well as any supplemental terms and conditions agreed to by the parties in writing. This Agreement shall not be modified or amended except by a writing signed by authorized representatives of both parties.

IN WITNESS WHEREOF, the parties have set their hand and seal intending to be legally bound this 30th day of April, 2003.

FUJITSU NETWORK
COMMUNICATIONS, INC.

Signature: _____

Print Name: _____George B. Chase_____

Title: ___Group President & COO____

Date: _____5/2/03_____

TELESECTOR RESOURCES GROUP, INC.

d/b/a Verizon Services Group

Signature: _George S Dowell___

Print Name: _George S. Dowell_

Title: _SVP - Corporate Sourcing_

Date: _5/9/03_____

Not for use or disclosure outside the Verizon Companies and its Affiliates except under written agreement between the parties hereto